CATERAIR INTERNATIONAL,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 93–1008.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 5, 1994.

Decided April 29, 1994.

Ivan H. Rich, Jr., Louisville, KY, argued the cause for petitioner. With him on the brief were Thomas K. Wotring and Dean C. Berry, Washington, DC.

Frederick C. Havard, Supervisory Atty., N.L.R.B., Washington, DC, argued the cause, for respondent. With him on the brief were Frederick L. Cornnell, Atty., N.L.R.B., Linda Sher, Acting Associate Gen. Counsel, N.L.R.B., and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, DC.

Before WALD, EDWARDS, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Caterair International ("Caterair"), a company that furnishes meals and related services to the airlines, seeks review of an order of the National Labor Relations Board ("NLRB" or "Board") finding that the company committed unfair labor practices against Chauffeurs, Sales Drivers, Warehousemen & Helpers, Local 572, International Brotherhood of Teamsters, AFL–CIO ("Union"). Adopting the findings of the Administrative Law Judge ("ALJ"), the Board concluded that Caterair had impermissibly influenced the signing of a decertification petition and relied upon that tainted petition to refuse to recognize the Union in violation of §§ 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. § 158. The Board issued an order requiring Caterair to cease and desist from all unfair labor practices and compelling Caterair to bargain with the Union. Caterair contends that the record lacks sufficient evidence to support the Board's conclusions and that the Board failed adequately to explain its affirmative bargaining order. We affirm the Board's substantive conclusions and enforce the Board's order insofar as it requires Caterair to cease committing unfair labor practices. Because we agree that the Board did not provide the requisite explanation for its bargaining order, however, we remand as to that portion of the remedy so that the Board may supplement its decision.

## I. Background

### A. Factual Context

Caterair has provided food services for many of the nation's commercial airlines since it took over the operations of Marriott In–Flite Services in December 1989. Since September 1988, employees at three of Ca-

terair's present facilities in California have been represented in a single unit by Chauffeurs, Sales Drivers, Warehousemen & Helpers, Local 572, International Brotherhood of Teamsters, AFL–CIO. In 1989, the Union and Marriott In–Flite Services negotiated a contract that was effective from June 1, 1989 until May 31, 1991. Among other provisions, the contract contained a union security clause requiring that union dues and fees be deducted from the paychecks of employees who authorized such deductions. Caterair succeeded to the entire contract and recognized the Union when it assumed Marriott's operations.

By February 1991, Caterair employed roughly 750 unit employees and fifty-seven managers at the three facilities. Approximately 450 of those employees and thirty-nine managers worked at the largest of those three facilities ("Facility A"). Caterair employed about 275 unit employees and fourteen managers at the second facility ("Facility B"). The smallest facility employed only twenty-five unit employees and four managers ("Facility C"). As of February 1991, 403 unionized employees, or 54% of the unit, had authorized Caterair to deduct union dues and fees from their paychecks.

In December 1990 and January 1991, three employees asked Caterair's human resources director how to decertify the Union. The company prepared fliers responsive to their inquiries describing the process by which employees could request their fellow employees to sign a decertification petition expressing disaffection with the Union and requesting that the Board hold an election. These fliers stated that the petition had to be filed with the Board between sixty and ninety days prior to the expiration of the contract, a period that would run between March 2 and March 31, 1991. They also indicated that the petition had to be signed by at least 30% of the unit employees. One document explained that if more than 50% of employees signed the petition, Caterair could lawfully refuse to negotiate with the Union. The human resources director provided these informational sheets to the three inquiring employees and made them available to others upon request.

On or around February 22, 1991, employee Xiomara Menendez and others prepared a decertification petition stating that signers "d[id] not want the Union" to represent them any longer. During a one-week period beginning February 22, Menendez and about eight other employees solicited signatures at Facility A. Employee Bonnie Metcalf and three other employees simultaneously sought signatures at Facility B.

The evidence, as credited by the ALJ,[1] suggests that on or around February 22, several managers at both facilities began actively to solicit employees' signatures. Caterair's transportation manager at Facility A, Jose Castillo, called employee Luz Davalos at her desk to inquire whether she had "signed the paper to get rid of the Union." Transcript (Tr.) of February 4, 1992 Hearing (Testimony of Luz Davalos), at 72. When Davalos replied that she did not know what Castillo was referring to, Castillo said he would "send somebody else later to talk to" her. *Id.* Thirty minutes later, employee Dolores Vasquez visited Davalos at her desk and asked her to "sign the paper to get rid of the Union" and told her "not to be a dummy." *Id.* Davalos refused to sign. Manager Castillo approached Davalos in the cafeteria two hours later, asking her whether someone had come by to talk to her already. She responded affirmatively and reiterated that she would not sign anything. Davalos told three other employees about her encounter with Manager Castillo. *See id.* at 79.

During the same week, the production manager at Facility A, Alberto Pacheco, approached employee Rosa Rayas at her work area and inquired whether she had signed the petition "to get the Union out." Tr. of

---

1. Caterair does not contest the ALJ's decision to credit the testimony of seven employees that their signatures were solicited by management. Caterair also concedes that one employee, Israel Lopez, witnessed the solicitation of another employee, Hernandez. Caterair does, however, challenge the inferences drawn from the ALJ on

the basis of testimony by several employees that they witnessed managers talking to groups of employees and asking them to sign documents. This challenge addresses the conclusions the ALJ drew from witnesses' testimony, rather than the credibility of the testimony itself.

February 6, 1992 Hearing (Testimony of Rosa Rayas), at 401. When she said no, Manager Pacheco told her that if she did not sign, the Union would charge her "more than $200" in back dues. *Id.* at 404. He stated that the "Union was no good" because "the Union actually was a Mafia." *Id.* at 405. Pacheco also told her that her signature was necessary because "they only needed a few more signatures to finish the amount of signatures that the Government requires to get the Union out." *Id.* Rayas refused to sign.

On February 21 or 22, employee Carlos Sosa saw the sanitation manager at Facility A, Saul Monroy, talking to employees while holding a sheet of paper. Shortly thereafter, Monroy approached Sosa and asked him to sign a petition containing about nine signatures so that employees could "obtain better salaries, cheaper health program, and more days' vacation." Tr. of February 6, 1992 Hearing (Testimony of Carlos Sosa), at 422. Sosa was not able to get a good look at the petition, because Monroy had obscured the top of the page. Sosa refused to sign.

Manager Monroy solicited employee Jose Vasquez sometime between February 22 and 24 at the entrance to the dishwashing department. Monroy carried a clipboard and asked Vasquez to "sign the list." Tr. of February 4, 1992 Hearing (Testimony of Jose M. Vasquez), at 191. After Vasquez asked what the list was for, Monroy responded "that he was taking the signatures so that the Union will stay *in.*" *Id.* (emphasis added). Vasquez testified that everyone at the company knew he was pro-Union. He stated that he had been forewarned by fellow employees that this was merely a maneuver on Monroy's part to get him to sign the decertification petition to *oust* the Union. Vasquez did not sign.

On or around February 26, Manager Monroy brought a clipboard to employee Alfred Mercado at his work area in the dishwashing department and asked him to sign a piece of paper. Monroy refused to tell Mercado what the piece of paper was for, although Mercado assumed it was the decertification petition that he had heard talk of around the workplace. *See* Tr. of February 6, 1992 Hearing (Testimony of Alfred Mercado), at 447. Mercado refused to sign.

Manager Monroy approached employee Victor Saldana in late February in the dishroom. He showed Saldana a clipboard on which he was collecting signatures, but obscured the actual petition under a white sheet of paper. Monroy asked Saldana if he would "sign to be able to get the Union out." Tr. of February 7, 1992 Hearing (Testimony of Victor Saldana), at 512. Monroy told Saldana that signing would be "good" for him, and asked him "Why do you have to pay $15 per month and when they fire you, you're not going to get any help?" *Id.* Saldana refused to sign and testified that he later told six or seven employees about the exchange.

On February 26, the assistant manager at Facility B, Oscar Peralta, spoke with employee Israel Lopez in the cafeteria in the presence of employee Teresa Reveco and six or seven others. Peralta handed Lopez "a petition to get the Union out" and asked him to sign it. Tr. of February 4, 1992 Hearing (Testimony of Israel Lopez), at 108. Lopez observed a paper that was approximately three-fourths full of signatures.[2] Explaining to Peralta that he was a Union Shop Steward, Lopez refused to sign. Lopez later witnessed Peralta soliciting the signature of employee Hector Hernandez. *See id.* at 112. Lopez heard Hernandez refuse to sign. Lopez told as many as twenty employees about his exchange with Manager Peralta.

Although Caterair vigorously disputes the conclusions of the ALJ drawn from such evidence, contending that the evidence does

---

**2.** During the hearing before the ALJ, both Israel Lopez and Luz Davalos exhibited some confusion in describing the papers they were asked to sign. Lopez maintained that the paper he saw was white and unlined and that it bore Bonnie Metcalf's signature. The page of the petition submitted to the Board that bore Metcalf's signature, however, was lined. Davalos testified that Dolores Vasquez had held both a white sheet of paper and a yellow legal pad. Although Vasquez never showed the petition to Davalos, Davalos had the impression that the petition was on yellow paper. None of the forty-eight sheets comprising the completed petition was yellow. Significantly, Caterair does not now challenge the ALJ's decision to credit the testimony of Lopez and Davalos that they were personally solicited by management.

not sustain the ALJ's inference that managers solicited any actual signatures on the petition, the ALJ also credited the testimony of several employees that they saw managers talking to groups of employees and handing them sheets of paper to sign during this period. On February 22, employee Jose Lara saw Manager Monroy talking to ten employees while holding a piece of paper. Lara saw three employees sign the paper while Monroy held it for them. Later that day, Lara saw Monroy talking to about five other employees, and he witnessed another employee signing the paper. *See* Tr. of February 4, 1992 Hearing (Testimony of Jose Lara), at 178–80. Employee Davalos reported seeing Monroy talking to three or four employees in the cafeteria on February 23, after she had been solicited by Manager Castillo. Monroy was holding a piece of paper and offering the employees his pen. *See id.* (Testimony of Luz Davalos), at 77. Employee Myrna Silva saw Monroy talking to a group of about ten or eleven employees on February 25. He was holding a piece of paper nearly half-filled with signatures, on which he appeared to be making notes. Silva heard Monroy ask the employees "to sign the paper to get the Union out because the Union was stealing from [them]." Tr. of February 7, 1992 Hearing (Testimony of Myrna Silva), at 536. Employee Mercado, who had himself been solicited by Monroy, also saw Monroy later talking to several other employees. *See* Tr. of February 6, 1992 Hearing (Testimony of Alfred Mercado), at 445.

By March 4, 1991, the decertification petition contained 428 employee signatures, representing 57% of the bargaining unit. Several employees filed the petition with the Board on that day so as to begin the process of official decertification. In a March 15 letter, the Union asked Caterair to bargain for a new contract. Caterair responded by letter of March 20 that it had a "good faith doubt" about the Union's majority status, citing the decertification petition supported by a majority of employees. Caterair refused to begin negotiations with the Union on a new contract.

After several employees discussed the possibility of striking over Caterair's refusal to bargain, the general manager of Facility A, Jose Ramirez, called employee Daniel Godoy into his office in early April. Ramirez told Godoy that he knew Godoy had been "agitating" among the employees in an effort to initiate a strike. Ramirez told Godoy that his actions were illegal and that he could be fired. *See* Tr. of February 5, 1992 Hearing (Testimony of Daniel Godoy), at 315. On May 22, the Union held an employee meeting at which the employees voted by written ballot to go on strike in response to Caterair's refusal to negotiate. The margin in favor of a strike was 318 to 6, that is, 42% of the total unit voted in favor of striking.

According to further testimony credited by the ALJ, management attempts to dissuade strikers continued. In late May, human resources director Millie Bisono told employee Jerry Hayes that he would be fired if he joined the strike. *See* Tr. of February 5, 1992 Hearing (Testimony of Jerry Hayes), at 282. On May 31, labor relations director Roberto Velazquez had a conversation with employee Fulgencio Plascencia in which Velazquez stated that Caterair "did not want the Union" and that all striking employees would be "automatically fired." Tr. of February 6, 1992 Hearing (Testimony of Fulgencio Plascencia), at 353. Velazquez told employee Castulo Flores the same thing the next day. *See* Tr. of February 6, 1992 Hearing (Testimony of Castulo Flores), at 378. On June 3, Manager Castillo told employee Willie Land that if she intended to strike, she would be out of a job. *See* Tr. of February 7, 1992 Hearing (Testimony of Willie E. Land), at 502.

The strike began on June 3, 1991 and involved 289 striking employees, or 39% of the unit. Sixty-one of the striking employees had previously signed the decertification petition. Caterair began hiring permanent replacements for the strikers almost immediately. Caterair unilaterally granted a wage increase of 4–6% to employees on August 31, 1991, during the pendency of the strike.

The Union ended the strike in early October and made an unconditional offer by letter of October 3, 1991 to have the strikers return to work. The letter called the strike an unfair labor practice strike and asked the

company to dismiss replacement employees and reinstate the striking workforce. Caterair refused to reinstate any of the strikers and denied that the strike had been motivated by Caterair's unfair labor practices.

## B. Board Proceedings

The Union filed its initial unfair labor practice charge on March 11, 1991, alleging management solicitation of signatures for the decertification petition and management coercion of signatures in violation of §§ 8(a)(1) and (3) of the National Labor Relations Act. The Union supplemented this charge with an allegation that Caterair had violated § 8(a)(5) by refusing to bargain. The Board dismissed this latter charge on June 27, 1991 on the grounds that·Caterair had relied upon the decertification petition in formulating its belief that the Union did not command majority support. However, the Board reversed itself with respect to this dismissal on September 30, 1991, issuing a multi-count complaint alleging that management solicitation had impermissibly tainted the decertification petition, thus invalidating Caterair's reliance, and that the résulting strike was motivated by Caterair's unfair labor practices.

The hearing before the ALJ took place in February 1992. Twenty-eight employees testified on behalf of the Union, the majority of them relating either that managers had solicited their signatures or that they had witnessed managers talking to groups of employees and asking them to sign papers. None of the testifying employees had actually signed the petition. Four managers testified, denying that they had solicited employee signatures for the petition. At least one manager testified that he often carried around a clipboard and asked employees to sign work-related documents.

The ALJ credited the employee-witnesses' testimony and discredited the conflicting managers' testimony, concluding that the managers had engaged in "widespread and conspicuous" solicitation of employees' signatures in violation of § 8(a)(3) of the National Labor Relations Act. The ALJ noted that Caterair's managers had on a few occasions promised benefits or made mild threats to

employees in an effort to procure their signatures, in violation of § 8(a)(1) of the Act. Considering all of the circumstances, the ALJ concluded that Caterair's unlawful solicitation had tainted the entire petition. Acknowledging testimony of the employee rumor mill, the ALJ reasoned that even those employees who had not personally been solicited by management had presumably been aware of and influenced by management's full-scale efforts. Accordingly, the ALJ determined that Caterair had violated § 8(a)(5) of the Act by relying upon the tainted decertification petition as the basis for withdrawing recognition of and refusing to bargain with the Union. The ALJ also concluded that the strike was motivated by Caterair's unfair labor practices, a conclusion Caterair does not now challenge.

After finding these violations, the ALJ proceeded to the remedial inquiry, ordering Caterair to cease and desist from interfering with its employees' rights under § 7 of the National Labor Relations Act to form, join, or assist labor organizations of their own choosing. The ALJ also ordered Caterair to reinstate strikers to their former jobs and to provide backpay from the date of the Union's unconditional offer to return to work, October 3, 1991. Finally, the ALJ ordered Caterair to recognize and bargain with the Union upon its request as the collective bargaining representative of employees in the unit.

On December 15, 1992, the Board adopted the ALJ's substantive conclusions and remedial suggestions. The Board made only a minor technical modification, adding to the remedial order the requirement that Caterair preserve its payroll and personnel records to facilitate the determination of backpay. Caterair filed this timely petition for review.

## II. Analysis

### A. Standard of Review

The standard of review governing this case is by now familiar. We must uphold the Board's factual findings if they are supported by substantial evidence. *See* 29 U.S.C. § 160(f) ("the findings of the Board with respect to questions of fact if supported by substantial evidence on the record consid-

ered as a whole shall ... be conclusive"); *Sullivan Indus. v. NLRB,* 957 F.2d 890, 894 (D.C.Cir.1992); *Williams Enterprises v. NLRB,* 956 F.2d 1226, 1232 (D.C.Cir.1992); *Avecor, Inc. v. NLRB,* 931 F.2d 924, 928 (D.C.Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992); *St. Agnes Medical Ctr. v. NLRB,* 871 F.2d 137, 144 (D.C.Cir.1989). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). We owe substantial deference to inferences drawn from these facts. *See Avecor,* 931 F.2d at 928; *Peoples Gas Sys., Inc. v. NLRB,* 629 F.2d 35, 42 (D.C.Cir.1980). Additionally, we must accept the ALJ's credibility determinations, as they are adopted by the Board, unless they are patently without basis in the record. *See NLRB v. Creative Food Design Ltd.,* 852 F.2d 1295, 1297 (D.C.Cir.1988).

■ We must also give great deference to the NLRB's selection of remedy. *See Avecor,* 931 F.2d at 928 (citing *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)). We have given consistent credence to the fact that "the Board draws on a fund of knowledge and expertise all its own." *Gissel Packing,* 395 U.S. at 612 n. 32, 89 S.Ct. at 1940 n. 32; *Sullivan Indus.,* 957 F.2d at 894. Our essential task as a reviewing court is to assure ourselves that the Board "has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act." *Peoples Gas,* 629 F.2d at 42.

### B. *Substantial Evidence*

■ Caterair's primary contention on review is that the evidence fails to sustain the ALJ's conclusion that management's efforts actually influenced any of the 428 employees who signed the decertification petition. Caterair asks us to deem dispositive the fact that none of the 428 employees who actually signed the petition testified to having been solicited by management. Caterair con-cedes, for purposes of this appeal, that managers solicited the signatures of employees Davalos, Lopez, Rayas, Jose Vasquez, Sosa, Mercado, Saldana, and Hernandez. Caterair also concedes that several witnesses observed managers talking to groups of employees during this period, sometimes during the lunch hour and sometimes at work, often asking employees to sign pieces of paper. However, Caterair contends that, with one exception, none of the witnesses to manager-employee conversations overheard the substance of these exchanges or observed the contents of the managers' papers. Caterair urges that the testimony of Myrna Silva, who did overhear Monroy talking to ten employees about signing the decertification petition, be discounted in determining causation. Silva testified that she saw Monroy making "notes" on his paper. Not one of the forty-eight pages of the petition, according to Caterair, contains margin notes.

Caterair's challenge cannot prevail. The inference drawn by the ALJ, that managers talking to groups of employees in the cafeteria and at various work sites during this one-week period were attempting to solicit signatures for the petition, is neither fanciful nor weak. Several of the witnesses who testified that they saw managers talking with employees while holding sheets of paper—Sosa, Lopez, Davalos, and Mercado—had actually been solicited by managers themselves. Manager Monroy, who solicited testifying employees Sosa, Jose Vasquez, Mercado, and Saldana, was seen by Lara talking to fifteen employees; by Davalos talking to three or four employees; by Sosa talking to "groups of four or five persons at a time"; by Silva talking to ten or eleven employees; and by Mercado talking to three employees during the one-week period. Lara, Davalos, and Silva all saw Monroy holding a pen and a clipboard. Lara saw four employees sign Monroy's paper. Davalos saw Monroy hand an employee his pen. Giving this circumstantial evidence its due, and giving appropriate deference to the ALJ's credibility determinations, we find the inference that Caterair's management solicited a considerable number of signatures not only far from weak, but virtually inescapable.

Moreover, as the ALJ observed, employees who signed the petition at the behest of other employees were undoubtedly aware of management's obvious efforts to engineer the decertification. According to their own testimony, employee Davalos told three people about management's activities; Lopez told twenty; Jose Vasquez told four. Most of the testifying employees had heard of management efforts through co-workers. Employee Davalos' testimony also suggests that at least one *employee* who sought signatures was working under the auspices of Manager Castillo. We find no cause to quibble with the ALJ's conclusion, adopted by the Board, that signing employees were influenced by pervasive management efforts to procure signatures.

Our conclusion stands without regard to Myrna Silva's testimony, so it matters not at all that she testified she saw Monroy making "notes" on his clipboard, while none of the submitted pages of the petition bore margin notes. But in any case the mere fact that Silva saw Monroy write *something* on the clipboard does not in our view fatally undermine her testimony. "Notes" may be erased or may be on sheets of paper other than the petition itself.[3] "Notes" may also constitute the printed names of employees, rather than margin doodles. In other words, we do not ascribe to this testimony the significance Caterair suggests, and we do not see this evidence "fairly detract[ing]" from the weight of testimony suggesting pervasive management intervention. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

Finally, despite Caterair's argument to the contrary, we do not view this as an instance in which employees' "brewing discontent with the Union" is or was immediately evident, so as to substantiate the conclusion that the decertification petition genuinely reflected an anti-Union animus on the part of employees. *Cf. Hotel, Motel & Restaurant Employees Union Local No. 19 v. NLRB*, 785 F.2d 796, 800 (9th Cir.1986) (employee discontent made connection between employer's conduct and loss of support weak). A majority of work-

ers in the unit continued to have union dues deducted from their paychecks in February 1991. Caterair makes much of the fact that only 39% of unit employees participated in the strike. However, given substantial evidence in the record that Caterair actively engaged in the intimidation of potential strikers, we cannot ascribe great weight to this point. It is noteworthy, on the other hand, that while the petition itself commanded majority support by only fifty-three signatures, sixty-one of the workers who had signed the petition later participated in the strike. If the sixty-one striking employees were subtracted from the number of employees originally signing the petition, the resulting number of signatures would represent *less* than majority support. On balance, we think it plain that employees did not demonstrate sufficient hostility to the Union to override the substantial weight of other evidence indicating pervasive management influence over the decertification petition.

## C. *The Board's Bargaining Order*

■ Caterair's second argument has significantly more merit. Caterair contends that the Board erred in imposing an affirmative bargaining order without (1) demonstrating that it gave appropriate consideration to employees' rights under § 7 of the National Labor Relations Act, 29 U.S.C. § 157, to select their own bargaining representative, or (2) explaining why other remedies were inadequate. With nary a word of explanation, the Board adopted the ALJ's recommendation and imposed not only a cease and desist order requiring Caterair to discontinue unfair labor practices, including "failing and refusing to bargain with the Union," but also an affirmative bargaining order compelling Caterair to "recognize and bargain, upon request, with the Union as the collective bargaining representative of its employees."

Although it might to the layman seem like lawyerly overkill to require Caterair simultaneously to cease refusing to bargain *and* to bargain upon request, the cease and desist and affirmative bargaining orders have very different legal and practical consequences.

---

3. Several employees testified that managers obscured the petition by cover sheets. It is by no

means clear, then, that Monroy made notes on the actual petition.

We have previously recognized that an affirmative bargaining order is an "extreme remedy," because according to time-honored Board practice it comes accompanied by a decertification bar that prevents employees from challenging the Union's majority status for at least "a reasonable period." *Sullivan Indus. v. NLRB*, 957 F.2d 890, 903 (D.C.Cir. 1992); *Williams Enterprises v. NLRB*, 956 F.2d 1226, 1237 (D.C.Cir.1992).[4] The statute does not mandate that a decertification bar accompany a bargaining order, and the Supreme Court has neither required nor disclaimed its use. Nor do we. However, the Board has long followed the practice of distinguishing between affirmative bargaining orders on the one hand and remedial cease and desist orders that have the effect of compelling bargaining on the other, requiring a decertification bar for a reasonable period of time in the former, but not the latter, context.[5] *See, e.g., Masada Communications, Ltd.*, 293 N.L.R.B. 931, 933 (1989) (Cracraft, concurring).

Despite its employee-protective effects in certain circumstances, for example in safeguarding a fragile union against the lingering effects of massive employer coercion, a decertification bar, whatever its duration, also prevents employees from exercising their right to dislodge the union however their sentiments about it may change. Decertification bars thus touch at the very heart of employees' rights under the National Labor Relations Act, and may have the effect of squelching, albeit temporarily, the right of employees "to form, join, or assist labor organizations [and] to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Because "effectuating ascertainable employee free choice [is] as important a goal as deterring employer misbehavior," *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969), we have consistently required

some indication from the Board that it has engaged in that "balancing which is an essential component of any valid exercise of discretion" of employee rights against union protection before imposing an affirmative bargaining order. *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 45 (D.C.Cir.1980); *see also Sullivan Indus.*, 957 F.2d at 904; *Williams Enterprises*, 956 F.2d at 1237; *Avecor, Inc. v. NLRB*, 931 F.2d 924, 937–38 (D.C.Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992); *St. Agnes Medical Ctr. v. NLRB*, 871 F.2d 137, 147–48 (D.C.Cir.1989).

It is perhaps useful to note that the Board has employed affirmative bargaining orders and their concomitant decertification bars in two very different contexts. The first is exemplified by *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), in which nonincumbent unions claimed representative status on the basis of their possession of authorization cards from a majority of employees, and the employers refused recognition. The Supreme Court, in upholding the Board's finding that the employers' actions constituted unfair labor practices, recognized the existence of two different remedies in the Board's arsenal: directing an election, or, if the employer's illegal conduct had so diminished the union's strength as to make an election inherently unfair, ordering the employer to bargain with the union for a reasonable time. *See id.* at 612, 89 S.Ct. at 1939.

The case before us involves the second situation in which the Board has resorted to affirmative bargaining orders. Here, the employer wrongfully refused to bargain with an *incumbent* union. Unlike the aspirant unions in *Gissel*, an incumbent union has an established base and enjoys a rebuttable presumption of continued majority status, which subsumes the continued right to bar-

---

4. The cease and desist order, in stark contrast, merely requires an employer to "conform his conduct to the norms set out in the Act.... No further penalty results." *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 740, 81 S.Ct. 1603, 1609, 6 L.Ed.2d 762 (1961).

5. In *Sullivan Indus.*, 957 F.2d at 903 n. 5, this court invited the NLRB to clarify its position on

remand if it did not in fact attach these consequences to the two different orders. The NLRB did not urge a contrary position in this case, and appears for all intents and purposes to continue its practice of imposing decertification bars of "reasonable" length when it issues bargaining orders.

gain. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 38, 107 S.Ct. 2225, 2233, 96 L.Ed.2d 22 (1987); *Sullivan Indus.*, 957 F.2d at 897.[6] Thus, in the incumbent union context, but not in the *Gissel* context, there is a sound third option in addition to the two remedies recognized in *Gissel:* mandating return to the status quo, under which the employer refuses to bargain only at the peril of inviting an unfair labor practice charge. The cease and desist order issued by the Board in this case is a prime example of this third option. As is utterly clear, under the cease and desist order, *Caterair is required to bargain with the Union.* The *only* critical difference between the cease and desist order issued in this case, which we affirm, and the bargaining order, which we remand, is that under the cease and desist order, employees remain free to petition for decertification.[7]

 Because the Board availed itself of what appears to be a more than satisfactory remedy in this case, the cease and desist order compelling Caterair to recognize and bargain with the Union, we must insist that the Board affirmatively demonstrate its consideration of the competing values at stake before imposing the additional sanction of a bargaining order. As we observed in *Avecor*, "a bargaining order is not a snake-oil cure for whatever ails the workplace; it is an 'extreme remedy' that must be applied with commensurate care." 931 F.2d at 938–39 (citation omitted). Five times in the past fourteen years this court has remanded such orders to the Board with a request for explanation as to why, in the particular circumstances, the extra protection against decertification was necessary. This case makes it an even half-dozen. We must assume the Board will deign to provide the necessary explanation at some point in order to obtain enforcement. We persist not out of pique

but from a sense that it is our duty to ensure that the Board adheres to its statutory mandate. Once more we cannot fulfill this task on the meager record the Board has seen fit to put before us.

### III. Conclusion

For the foregoing reasons, we affirm the substantive conclusions of the Board and enforce the Board's remedial order to the extent that it requires Caterair to cease and desist from committing unfair labor practices. We are unable, however, to evaluate the Board's affirmative bargaining order without the benefit of an explanation of why the Board thought it necessary. Accordingly, we remand on that score.

*Enforced in part and remanded in part.*

---

6. During the first year after a union is certified by the Board, it is usually entitled to a conclusive presumption of majority status. *See Fall River Dyeing*, 482 U.S. at 37, 107 S.Ct. at 2233.

7. Of course, even under a cease and desist order employees would be subject to the contract bar rule, under which an effective collective bargaining agreement acts as a bar to decertification unless the petition for decertification is filed

more than sixty and less than ninety days before the expiration of the agreement. *See, e.g., Donald Schriver, Inc. v. NLRB*, 635 F.2d 859, 868 n. 10 (D.C.Cir.1980), *cert. denied*, 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981); *Dalewood Rehabilitation Hosp., Inc. v. NLRB*, 566 F.2d 77, 79 n. 2 (9th Cir.1977). In the absence of a collective bargaining agreement, the contract bar rule does not apply.