United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 9, 1998 Decided June 26, 1998 

 No. 97-1417

 Exxel/Atmos, Inc., 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 United Steelworkers of America, 

 Intervenor 

 Consolidated with

 No. 97-1418

 

On Petitions for Review and Cross-Application for 
Enforcement of Orders of the National Labor 
Relations Board

 Vincent J. Apruzzese argued the cause and filed the briefs 
for petitioner.


 David A. Fleischer, Senior Attorney, National Labor Rela-
tions Board, argued the cause for respondent. With him on 
the brief were Linda Sher, Associate General Counsel, and 
Aileen A. Armstrong, Deputy Associate General Counsel. 
Margaret A. Gaines, Supervisory Attorney, entered an ap-
pearance.

 Daniel M. Kovalik argued the cause for intervenor United 
Steelworkers of America. With him on the brief were Lau-
rence Gold, David Silberman, and James Coppess.

 Before: Wald, Sentelle, and Randolph, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Randolph.

 Concurring opinion filed by Circuit Judge Sentelle.

 Randolph, Circuit Judge: These are petitions by Exxel/At-
mos, Inc. to review, and cross-petitions by the National Labor 
Relations Board to enforce, two orders issued in June 1997. 
The Board issued the first of its orders on remand from our 
decision in Exxel/Atmos, Inc. v. NLRB, 28 F.3d 1243 (D.C. 
Cir. 1994). The second order dealt with events in late 1994 
and early 1995, after the remand.

 Exxel is a small New Jersey company manufacturing non-
gas aerosol delivery systems. In September 1990 the compa-
ny voluntarily recognized the United Steelworkers of Amer-
ica, AFL-CIO as the exclusive bargaining representative of 
its production and maintenance employees. Nine months 
later, in May 1991, Exxel refused the union's request to 
bargain. The Board found that Exxel had thereby violated 
s 8(a)(1) and (5) of the National Labor Relations Act, 29 
U.S.C. s 158(a)(1) & (5). See Exxel-Atmos, Inc. ("Exxel I"), 
309 N.L.R.B. 1024, 1024 (1992). Among other things, it 
ordered Exxel to cease and desist from refusing to bargain 
with the union and affirmatively "to recognize, meet and 
bargain collectively in good faith" with the union upon re-
quest. Id. at 1024, 1033. This court upheld the Board's 


findings of violations of the Act and enforced the cease and 
desist order, but--on the basis of longstanding precedent in 
this circuit--we refused to enforce the bargaining order and 
remanded the case to the Board for a "clear explanation" of 
"why a bargaining order, as opposed to the cease and desist 
order standing alone, was justified in this case." Exxel/At-
mos, 28 F.3d at 1248-49; see Exxel/Atmos, Inc. v. NLRB, No. 
93-1108 (D.C. Cir. Nov. 14, 1994) (enforcing Board's order in 
part and remanding case in part).

 The Board responded by reaffirming the bargaining order 
in a June 1997 supplemental decision. See Exxel-Atmos, 
Inc., 323 N.L.R.B. No. 159 (June 5, 1997). On the same date, 
the Board issued another decision and order finding the 
company guilty of additional unfair labor practices. On De-
cember 7, 1994, after our remand, Ronald Lemke, Exxel's 
President, gave a speech to the production and maintenance 
employees in which he explained the procedure for decertify-
ing the union and informed the employees that Exxel was 
obligated to bargain with the union unless it was decertified. 
Exxel also gave each of its employees a cash Christmas bonus 
of $100 during the week of December 23. On January 10, 
Exxel, pointing to signed letters to the Board from some 
employees indicating that they no longer wished to be repre-
sented by the union, canceled all bargaining sessions with the 
union, then scheduled for early 1995. Employees filed a 
decertification petition on January 26, and thereafter Exxel 
took the position that it was under no obligation to bargain 
until a decertification election had been held. The Board 
concluded that Lemke's speech, the Christmas bonus, and 
Exxel's refusal to bargain violated s 8(a)(1) and (5) of the 
Act. See Exxel-Atmos, Inc. ("Exxel II" ), 323 N.L.R.B. No. 
158, slip op. at 3 (June 5, 1997). As a remedy, the Board 
again, inter alia, ordered Exxel both to cease and desist from 
refusing to bargain and affirmatively to bargain with the 
union upon request. See id.

 I

 We shall deal first with the Board's decision in Exxel II, 
and Lemke's speech. Employer speech or conduct violates 
s 8(a)(1) if it "interfere[s] with, restrain[s], or coerce[s] em-


ployees" in their decision whether to decertify the union. 29 
U.S.C. s 158(a)(1). On the other hand, the "expressing of 
any views, argument, or opinion, or the dissemination thereof, 
whether in written, printed, graphic, or visual form, shall not 
constitute or be evidence of an unfair labor practice ... if 
such expression contains no threat of reprisal or force or 
promise of benefit." 29 U.S.C. s 158(c).

 The Board's explanation for finding a s 8(a)(1) violation in 
Lemke's speech consists of the following (323 N.L.R.B. No. 
158, slip op. at 2):

 In his unsolicited speech, the Respondent's president, 
 Lemke, provided the unit employees with instructions on 
 how to decertify the Union. In doing so, the Respondent 
 unlawfully instigated the decertification petition among 
 its employees in violation of Section 8(a)(1) of the Act.* 

_______

 * Weisser Optical Co., 274 NLRB 961 (1985), and cases cited 
 therein.

The text tells us nothing. It merely recites the Board's 
conclusion that the speech was "unlawful." The Board's 
rationale, therefore, must be contained in the footnote sug-
gesting that Lemke's speech was indistinguishable from the 
employer conduct condemned in Weisser Optical and "the 
cases cited therein." 

 In Weisser Optical, the Board found a s 8(a)(1) violation 
because the company provided more than "ministerial aid" to 
its employees in filing a decertification petition. A company 
official had asked an employee to initiate and solicit signa-
tures for a decertification petition among the rank-and-file, 
"explaining that he wanted to rid the [company] of the 
Union." 274 N.L.R.B. at 961. When the employee agreed, 
the official gave him a booklet containing instructions and 
sample language to be used in gathering evidence of employ-
ee interest. See id. The employee then apparently aban-
doned the idea, so management approached a second employ-
ee "about getting something started." Id. (internal quotation 
marks omitted). After a meeting at which the company 
expressed its belief that no "third party" was needed to work 
out any differences the employees might have with the com-


pany, the first employee immediately began soliciting signa-
tures for a decertification petition. See id. The petition 
arrived at the Board only a few days later. See id. Such 
"unsolicited involvement with the showing of interest peti-
tion," held the Board, "constituted far more than ministerial 
aid" and hence violated s 8(a)(1) of the Act.

 The "cases cited therein," in Weisser Optical that is, turn 
out to be only one case--Silver Spur Casino, 270 N.L.R.B. 
1067 (1984).1 There, the employer had suggested to an 
employee--at work and in phone calls to her at her home--
that a decertification petition ought to circulate among the 
employees. See id. at 1071-72. The employer provided her 
with language to use in the petition, approved a draft, told the 
employee how to circulate it and among whom, gave her 
instructions on getting it signed and dated, and told her 
where to send it. See id. When a different employee 
approached the employer with concerns about a union, the 
employer provided similar assistance for a second petition. 
See id. at 1072. The employer then mailed both petitions to 
the Board. See id. The ALJ held that the employer's 
actions violated s 8(a)(1) because they "constitute[d] far more 
than the mere ministerial aid such as the Board might not 
find unlawful." Id. The Board upheld the ALJ's conclusion, 
stating that the employer "unlawfully encouraged and assist-
ed the employees in repudiating the Union." Id. at 1067.

 Neither Weisser Optical nor Silver Spur help to explain the 
Board's conclusion in this case. Whatever the precise mean-
ing of "ministerial aid," neither decision goes so far as to hold 
that an employer violates s 8(a)(1) merely through state-

__________
 1 Weisser Optical also contained citations to Texas Elec. Coop., 
197 N.L.R.B. 10 (1972), and Craftool Mfg. Co., 229 N.L.R.B. 634 
(1977). The Board cited those cases, however, not to explain when 
an employer violates s 8(a)(1) by assisting employees in filing a 
decertification petition, but rather to support its statement that 
reliance on a tainted decertification petition is no defense to a 
withdrawal-of-recognition charge. See Weisser Optical, 274 
N.L.R.B. at 962.


ments informing employees of the decertification process. 
The Board explicitly rejected such a reading of s 8(a)(1) in 
Lee Lumber & Bldg. Material Corp., 306 N.L.R.B. 408 (1992). 
The employer there had called a meeting and pointed out the 
disadvantages of switching to a union-proposed pension plan. 
See id. at 408. In response to employee questions about how 
to get rid of the union, the employer gave the employees 
general information about the decertification process and the 
location of the Board's office, adding that any decertification 
petition "would have to be filed soon." Id. The Board 
thought the employer's statements caused concern among the 
employees and triggered the filing of a decertification peti-
tion. See id. at 410. Even so, it held that this did not make 
the statements unlawful under s 8(a)(1). "It is clear that, 
under Section 8(c), an employer may lawfully furnish accurate 
information ... if it does so without making threats or 
promises of benefits.... Otherwise lawful statements do not 
become unlawful ... [under s 8(a)(1) ] merely because they 
have the effect (intended or otherwise) of causing employees 
to abandon their support for a union." Id. at 409-10 (foot-
notes omitted). The employer's motive and the actual effect 
of its statements are irrelevant. See id. at 409. Instead, "the 
test is whether the employer's statements may reasonably be 
said to have tended to interfere with employees' exercise of 
their Section 7 rights." Id. (footnote omitted); see also 
Lucky 7 Limousine, 312 N.L.R.B. 770, 804 (1993).

 Lemke's speech did not offend this standard. Lemke, and 
hence Exxel, doubtless intended to do more than merely 
make a public service announcement. It is fair to assume 
they hoped the employees would act on the information. But 
Lee Lumber makes the motivation of the employer irrelevant. 
As to the content of the speech, the part with which the 
Board took issue simply informed Exxel's employees that a 
decertification procedure existed for employees who decided 
they no longer wanted to be represented by a union.2 For all 

__________
 2 The Board focused on the following portion of Lemke's 
speech:


we know, the employees were already aware of this. After 
briefly (and accurately) explaining the procedure, Lemke said 
that anybody "who wants more information ... can call the 
Labor Board to get more details about how to file for [a 
decertification] election." J.A. 61. He also left copies of the 
Board's address and phone number in the meeting room. 
Before concluding, Lemke told the employees, "The decision 
about whether to file a petition with the Labor Board for a 
Decertification Election is entirely up to you. The Company 
will not take any action against anyone because he has or has 
not signed a petition." J.A. 61. We presume the Board saw 
something coercive or threatening in these statements, but 
we are unable to detect anything of the sort. Unlike the 
employers in Weisser Optical and Silver Spur, who arguably 
pressured individual employees to participate in the decertifi-
cation process, Lemke delivered his speech to Exxel's em-
ployees collectively. Moreover, his statements were remark-
ably similar to those in Lee Lumber, doubtless because an 
attorney for the company wrote the speech. Short of saying 
nothing at all, it is hard to see how Lemke could have been 
more careful about not interfering with the employees' free 

__________
 What if we don't want a union? Is there anything we can do 
 about it? Yes. The Labor Board has a procedure called a 
 Decertification Election. This would allow the employees to 
 vote, in a secret ballot election, on whether you truly want the 
 union to represent you. The Board will conduct a Decertifica-
 tion Election if 30% of the employees take or send a petition to 
 the Labor Board stating that they do not want the union to 
 represent them. Anybody who wants more information about 
 this procedure can call the Labor Board to get more details 
 about how to file for an election. I will leave copies of the 
 Labor Board's address and telephone number here in this 
 room. I want to say as clearly as I possibly can that the 
 Company intends to comply with the law and with the court's 
 order [in Exxel I]. The decision about whether to file a 
 petition with the Labor Board for a Decertification Election is 
 entirely up to you. The Company will not take any action 
 against anyone because he has or has not signed a petition.

J.A. 61.


choice and yet still informed them of the availability of the 
decertification procedure.

 At any rate, since the Board chose not to explain why it 
believed the speech constituted "unlawful instigation," its 
citation to a clearly distinguishable precedent is not enough to 
warrant sustaining its conclusion that Exxel violated 
s 8(a)(1).

 II

 On the Wednesday or Thursday before Christmas 1994, 
each employee received from Exxel a $100 bill contained in a 
greeting card signed by Exxel's management. The Board, 
pointing out that the " 'Christmas bonus' was related to the 
increased sales performance of [Exxel's] employees in 1994," 
found that the bonus "constitutes wages, and as such, is a 
proper subject for collective bargaining." Exxel-Atmos, 323 
N.L.R.B. No. 158, slip op. at 3. Exxel did not bargain with 
the union before awarding the bonus and so the Board 
concluded that the company violated s 8(a)(1) and (5). See 
id.3

 The Board's conclusion lacks substantial evidence. The Act 
requires employers to bargain collectively with unions over 
"wages, hours, and other terms and conditions of employ-
ment." 29 U.S.C. s 158(d). A "Christmas bonus ... be-
comes an element of wages and, therefore, a term and 
condition of employment that cannot be altered unilaterally" 
if it is "tied to other remuneration and paid regularly over an 
extended period." International Bhd. of Elec. Workers Local 
1466 v. NLRB, 795 F.2d 150, 153 (D.C. Cir. 1986). The bonus 
here was not tied to the wages of the employees. It was 
linked neither to seniority nor to each employee's individual 

__________
 3 Notably, the Board did not rest its conclusion that the Act 
was violated on a finding that Exxel presented the bonus with the 
intent of demonstrating to its employees "that the Union was 
irrelevant," or as part of a "concerted strategy to weaken and 
discredit the union in the eyes of the employees." Microimage 
Display Div. of Xidex Corp. v. NLRB, 924 F.2d 245, 253 (D.C. Cir. 
1991) (citation and quotation marks omitted). Such a finding would 
be subject to a very different analysis.


performance. And, perhaps most telling, there is no evidence 
that Exxel had ever paid such a bonus to its employees in the 
past. See id. (Christmas bonus found to be "a part of the 
employees' wages" where it was "a regular practice going 
back some forty years"); 5 Theodore Kheel, Labor Law 
s 19.04, at 19-18 to -19 (1997) (cases finding bonuses to be 
wages "have primarily relied on the regularity of the payment 
over a sufficient period of time"); Sykel Enters., Inc., 324 
N.L.R.B. No. 171, slip op. at 3-4 (Nov. 7, 1997) (crucial 
question in determining whether Christmas bonus constitutes 
wages is whether employer's pattern of paying bonus in past 
has justified employees' expectations that they could count on 
receiving it as part of wages in future as well).

 In short, the record plainly shows that the bonus was a 
seasonal gift. The previous Christmas, Exxel had hosted a 
buffet luncheon party for its employees. The next year it 
gave them cash because it was the first year Exxel had 
turned a profit. That did not transform the $100 bonus into 
"an integral part of [Exxel's] wage structure." Niles-Be-
ment-Pond Co., 97 N.L.R.B. 165, 166-67 (1951). 

 III

 This brings us to Exxel's refusal to bargain with the union 
in early 1995. In enforcing the Board's cease and desist 
order in Exxel I, we ordered Exxel to "[c]ease and desist 
from ... [w]ithdrawing recognition from and refusing to meet 
and bargain collectively with" the union. Exxel/Atmos, Inc. 
v. NLRB, No. 93-1108 (D.C. Cir. Nov. 14, 1994) (enforcing 
Board's order in part and remanding case in part). It was 
"utterly clear" that our order put Exxel under an affirmative 
obligation to bargain with the union as of November 30, 1994, 
the date our mandate issued. Caterair Int'l v. NLRB, 22 
F.3d 1114, 1123 (D.C. Cir. 1994).4 Even so, Exxel did next to 

__________
 4 An affirmative bargaining order and an order requiring an 
employer to "cease and desist" from refusing to bargain do not have 
the same consequences. Under settled Board practice, only the 
former carries with it a decertification bar, preventing the employer 
from challenging the union's majority status for a reasonable period 


nothing. It held no bargaining sessions with the union in the 
weeks leading up to January 10. And when on that date 
Exxel learned of an impending decertification effort on the 
part of some of its employees--it is unclear whether Exxel 
knew exactly how many employees supported the effort, but 
it is clear that no decertification petition had been filed at 
that time--it promptly canceled all planned bargaining ses-
sions with the union, including one scheduled for the next 
day. We acknowledge that under some circumstances an 
employer may suspend bargaining if it "can show, by 'clear, 
cogent and convincing' evidence, either that the union has lost 
majority support or that the employer has a reasonable, good-
faith doubt of continuing majority support." Microimage 
Display Div. of Xidex Corp. v. NLRB, 924 F.2d 245, 253 
(D.C. Cir. 1991) (citation omitted). We also recognize that 
Exxel twice requested by letter, once on January 10 and 
again on January 30, that the Board inform it whether a 
majority of Exxel's employees had petitioned for decertifica-
tion, and that the Board refused the request. But none of 
this excused Exxel from complying with our order. Exxel 
should have bargained with the union as soon as was prac-
tically possible following the issuance of our mandate. At the 
very least, it should have gone ahead with the scheduled 
bargaining sessions until January 26, when a formal decertifi-
cation petition was filed. See, e.g., St. Agnes Med. Ctr. v. 
NLRB, 871 F.2d 137, 146 (D.C. Cir. 1989); Allied Indus. 
Workers, Local Union No. 289 v. NLRB, 476 F.2d 868, 881 
(D.C. Cir. 1973); NLRB v. New Assocs., 35 F.3d 828, 833-35 
(3d Cir. 1994). Exxel's refusal to do so constituted a direct 
violation of our order and hence was clearly unlawful. 

 As a remedy for Exxel's recalcitrance, the Board once 
again issued a bargaining order. Relying on our decision in 
Exxel I, the company argues that the Board failed to justify 
the bargaining order. But there is an essential difference 
between the two cases: here, Exxel never contested the 
propriety of the bargaining order in the proceedings before 

__________
of time. See, e.g., Exxel/Atmos, 28 F.3d at 1248; Caterair, 22 F.3d 
at 1121-22 & n.4.


the Board. Accordingly, under s 10(e) of the Act, Exxel 
waived any right it had to object to the order before this 
court. See 29 U.S.C. s 160(e) ("No objection that has not 
been urged before the Board ... shall be considered by the 
court...."); Woelke & Romero Framing, Inc. v. NLRB, 456 
U.S. 645, 666 (1982) (failure to "object[ ] to the Board's 
decision in a petition for reconsideration or rehearing ... 
prevents consideration of the question by the courts"); Quaz-
ite v. NLRB, 87 F.3d 493, 497-98 (D.C. Cir. 1996) (refusing to 
consider employer's argument that Board did not adequately 
explain need for bargaining order because employer did not 
raise objection before Board). It is of no moment that the 
Board neglected to invoke s 10(e) in its brief to this court. 
Section 10(e) "speaks to courts, not parties," and the Board 
cannot waive its jurisdictional requirements simply by ne-
glecting to mention them before us. EEOC v. FLRA, 476 
U.S. 19, 23 (1986) (per curiam).5

 The petition for review in No. 97-1417 is granted in part 
and denied in part. Enforcement of the Board's order is 
denied on the speech and bonus questions in No. 97-1417. 
The remainder of the Board's order in No. 97-1417 is en-
forced. The petition for review in No. 97-1418, and the 
Board's cross-application for enforcement, are dismissed. See 
note 5, supra.

So ordered.

__________
 5 Because we enforce the Board's June 5, 1997, bargaining 
order in Exxel II, there is no need for us to consider whether the 
Board's supplemental opinion adequately supported the original 
bargaining order issued by the Board in Exxel I. The two bargain-
ing orders are effectively identical.



 Sentelle, Circuit Judge, concurring: I join without reser-
vation in the Court's conclusion that under section 10(e) of the 
Act, 29 U.S.C. s 160(e), we lack jurisdiction to review the 
second bargaining order. I write separately to express my 
hope (probably a vain one) that the Board will not find in our 
declining any suggestion that we consider the reasoning in its 
supplemental opinion adequate to support the extraordinary 
remedy invoked in its original bargaining order in Exxel/At-
mos, Inc. v. NLRB, 28 F.3d 1243 (D.C. Cir. 1994). In Exxel, 
we reiterated to the Board the well established law of this 
Circuit that the issuance of a bargaining order is an extraor-
dinary, "somewhat punitive," remedy which "has the effect of 
ensconcing the union as the employees' exclusive bargaining 
representative and therefore carries with it the potential of 
infringing upon employees' Section 7 rights." 28 F.3d at 1248 
(citing Caterair Int'l v. NLRB, 22 F.3d 1114, 1122 (D.C. Cir. 
1994)). Therefore, "we have time and again required the 
Board to explain that it has balanced the often competing 
interests of union protection and employee choice before 
issuing a bargaining order." Exxel, 28 F.3d at 1248 (citing, 
inter alia, Caterair, 22 F.3d at 1123). On remand, instead of 
complying with its duty to balance, the Board, continuing in 
the rogue behavior which we have noted time and again, 
simply declared the appropriateness of its original remedy, 
incredibly stating as its sole basis its prior decision in Cater-
air Int'l, 322 N.L.R.B. No. 11 (Aug. 27, 1996).

 Lest there be any doubt, the Board's Caterair is the very 
decision which we reversed, noting that we were ordering the 
Board for the sixth time to cease engaging in its contuma-
cious behavior. See Caterair, 22 F.3d at 1123. Once again, 
our orders and admonitions to the Board seem to have fallen 
on deaf ears. Not only does it continue to engage in precisely 
the process we have condemned in the past, but even cites in 
support of this recalcitrant behavior the Caterair decision for 
which we condemned it.

 As I have previously suggested, I think we have been 
overly gentle in our line of cases, including Caterair, rejecting 
the Board's facile imposition of the extraordinary bargaining 
orders remedy. See Lee Lumber & Bldg. Material Corp. v. 


NLRB, 117 F.3d 1454, 1463-64 (D.C. Cir. 1997) (Sentelle, J., 
concurring). In no other area of our enlightened democratic 
society would we permit an elitist bureaucracy to deprive 
citizens of their rights as free actors on the theory that they 
might have been so deceived by others of differing interests 
that they cannot by their free choice determine their best 
interests, but must be subjugated to the decision of an 
administrative agency. Id. While we can conceive of a 
commission regulating corporations tossing out the election of 
a corporate board based on deceit practiced against the 
shareholders, no one has ever suggested that such a commis-
sion could then impose indefinitely on the shareholders an 
unelected board, on the rationale that shareholder votes 
thereafter would be the product of "tainted" decisionmaking. 
We might even imagine an election of a public official being 
overturned because of fraud, but it is surely inconceivable 
that a board or commission could then impose its own choice 
of congressman, senator, or governor because of some con-
tinuing taint. Nonetheless, the NLRB persists in its elitist 
belief that those of the working class cannot be trusted to 
reject deceit on their own, and that, therefore, their benevo-
lent big brother must watch after them.

 Were we not bound by stare decisis, I would find few if any 
circumstances under which I would uphold a bargaining 
order. However, I recognize that this Court is bound by 
precedent. The time has long since come for the Board to 
recognize not only the constraints of precedent, but its statu-
tory and constitutional duty to obey the law as interpreted by 
the courts. Under 29 U.S.C. s 160, this Court has jurisdic-
tion to review the orders of the Board. On at least seven 
occasions we have exercised that jurisdiction to tell the Board 
that its routine imposition of remedial bargaining orders is 
contrary to law. See cases collected in Lee Lumber, 117 F.3d 
at 1461; Exxel, 28 F.3d at 1248. Eight is enough.