**SOUTHWEST MERCHANDISING CORPORATION, d/b/a Handy Andy, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 93–1859.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 9, 1995.

Decided May 12, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied July 26, 1995.*

* Silberman, Circuit Judge, would grant the petition for rehearing.

Frank S. Manitzas, San Antonio, TX, argued the cause and filed the briefs, for petitioner.

Paul J. Spielberg, Deputy Asst. General Counsel, N.L.R.B., Washington, DC, argued the cause, for respondent. With him on the brief were Linda Sher, Acting Associate General Counsel, Aileen Armstrong, Deputy Associate General Counsel, and David Seid, Attorney, N.L.R.B., Washington, DC.

Before WALD, SILBERMAN, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge SILBERMAN.

WALD, Circuit Judge.

This case returns to us on appeal for the second time. In the main, it poses a relatively straightforward issue of whether the National Labor Relation Board's ("NLRB" or "Board") determination that Southwest Merchandising Corporation ("Southwest") discriminated against certain employees of its predecessor, Handy Andy, Inc., on the basis of their participation in a strike against Handy Andy, is supported by substantial evidence. We conclude that it is. But we further conclude that the Board exceeded its authority in extending its remedy of reinstatement and backpay to three former strikers who never applied for jobs with Southwest. Accordingly, we grant only partial enforcement of its remedial order.

## I. BACKGROUND

In 1981, Handy Andy, a grocery store chain, filed in bankruptcy. At this point, Handy Andy's meat department employees were represented by Local 171 of the United Food and Commercial Workers International Union. In 1982, the Bankruptcy Court nullified Handy Andy's collective bargaining agreement with Local 171, and 24 of the meat department workers went on an economic strike shortly thereafter. Handy Andy's meat department employees subsequently voted against union representation in a decertification election, and, in November, the strikers unconditionally offered to return to work. Handy Andy rejected these offers on the grounds that their positions had been eliminated or filled.

On January 31, 1983, Handy Andy closed down its stores and terminated all its employees. The following day, February 1, 1983, Southwest bought the Handy Andy chain and rehired most of its managers. On February 2, Southwest opened its stores solely for the purpose of accepting job applications for service positions. By February 3,

after one day of taking applications, Southwest had completely restaffed its stores. Its meat department now employed 77 of the 92 people who had worked there immediately before the sale ("incumbent employees"). Although seven former strikers attempted to submit applications on February 2, only one application was accepted, and none of the strikers was hired.

## A. *The February 2 Hiring Process*

On the evening of February 1, Southwest held a meeting attended by company President Dan Regals, Personnel Director George Tamez, the officials in charge of the specialized departments—bakery, produce, and meat—and all the individual store managers. Southwest instructed the store managers to open their stores on February 2 in order to accept applications for all departments and to "accept all applications all day long." Transcript ("Tr.") 423. New employees would be selected that evening from among those who applied that day. In designing the job application process, Southwest expected that its managers—who were holdovers from the pre-sale company—would look for employees with whom they had prior good experiences, although it stoutly denies any preference for incumbent employees. While local media reported that the new owners of the Handy Andy stores were accepting job applications, they did not state when or where. Nor did Southwest make any effort to publicize that information.

Carl Schroat was in charge of hiring the meat department employees. According to Schroat, he was not authorized to hire any applicant who had not submitted an application on February 2, nor was he authorized to contact any employees to notify them of the deadline or request them to submit applications. Schroat testified that he received between 100 and 150 applications for meat department jobs from individual store managers on the evening of February 2, and that he selected the 77 incumbent employees from among those applications. He further maintained that none of these employees was granted any special notice of the application process beyond that of the general public. The record contains no direct evidence supporting or refuting that contention.

In selecting new hires, Schroat said he identified "the best people, in the applications, best productive people," and preferred those "that I had already known and that had been previously employed by us." Tr. 426–27. Schroat never said outright, however, that he preferred incumbent employees over strikers. To the contrary, Schroat maintained that he was familiar with the work of all the former strikers and, although some of them met his criteria, he did not consider them solely because they had not filed applications.[1]

In contrast to the meat department hiring process, individual store managers were responsible for filling the grocery department positions; they *were* authorized both to notify incumbent employees personally of the application process and to rehire incumbents on February 2 even if they did not formally apply. The store managers were allowed simply to inform employees to come into work on February 3 and fill out a job application at that time. Bob Simmons, one of the store managers, rehired forty of his fifty incumbent employees, even though he obtained no applications from ten of the forty on February 2. He notified the ten on the evening of February 2 that they were rehired and told them to fill out applications upon reporting to work the following day. Simmons further testified that none of the four meat department employees who had worked in his store under Handy Andy submitted applications to him on February 2,[2] but that he found he had a staff of four the following day, two from his prior store staff, two from other stores. Simmons did not know how these employees had been hired.

## B. *The Experience of the Former Strikers*

Seven former strikers attempted to apply for meat department jobs on February 2.

---

1. Schroat testified that he did not recall seeing the application of the one striker who actually submitted an application on February 2. Tr. 430.

2. Simmons received only one application for the meat department on February 2, from an individual who worked for a different chain. Tr. 385.

313 N.L.R.B. 616, 621 & n. 21, 1993 WL 513145 (1993). Six of these seven proved that they spoke on that day with an identified supervisor.[3] Only one, Frankie Danmon, managed to obtain and submit an application. The other six were informed that applications were no longer being given out, or that no applications were being accepted for the meat department. Four testified that when requesting an application, they had identified themselves as former strikers. Although one former striker was informed as part of a long line of applicants that applications had run out, the other strikers were told of the run-out individually (at least four of them before noon). *Id.;* Tr. 110, 239, 285, 316. Southwest never provided any explanation for this occurrence.

### C. *Post–February 2 Applications and Hiring*

Fourteen other former strikers attempted to apply for jobs at some point in February.[4] They generally identified themselves as former strikers and were informed that there were no openings in the meat department or that the store was not giving out any more job applications. Only Joe Huerta was able to submit an application, and he never heard back from Southwest.

Over the next nineteen months,[5] sixty meat department vacancies were filled yet no former strikers were hired for any of these positions. According to Schroat, "[i]n most cases, I was promoting apprentices and part-time people into full-time situations," but that did not mean "that . . . strikers were not considered." Tr. 447. He said that he considered those strikers from whom he had

applications, namely Danmon and Huerta, "if I needed full-time [employees]," and that this "could have [occurred] off and on several times." *Id.* As to why, in particular, he declined to hire Danmon and Huerta, Schroat testified that "I guess it was probably because of the previous experience I had with the production." He provided no further specifics or documentation. ALJ Decision, slip op. at 14 (Feb. 20, 1985). With respect to Danmon he testified alternatively that, over her fourteen years of employment, Danmon's problems "lasted a year or so," that they were "off and on," and they "could be two, three years." Tr. 452–53. The Administrative Law Judge ("ALJ") rejected Schroat's explanation of his refusal to hire Danmon and Huerta as pretextual.[6]

## II. THE BOARD'S DECISION

In its first opinion, the Board found that Southwest violated §§ 8(a)(3) and (1) of the National Labor Relations Act by refusing to hire former strikers because of their participation in a strike against Handy Andy and ordered backpay and reinstatement for each of the 24 former strikers. 296 N.L.R.B. 1001, 1989 WL 224363 (1989). This court remanded the Board's opinion for further clarification. *See Southwest Merchandising Corp. v. NLRB,* 943 F.2d 1354 (D.C.Cir. 1991). In particular, we sought explanation of (1) whether the Board relied on a theory that a successor company has a special obligation in hiring to favor its predecessor's employees without regard to whether they are incumbent workers or former strikers, (2) whether the Board had *sub silentio* inferred that the incumbent employees had

---

3. The Board states that in addition to the six who spoke to supervisors, "[o]ne and perhaps two former strikers were similarly turned away on February 2 by the nonsupervisory personnel." 313 N.L.R.B. at 621 n. 21. One of these former strikers testified that she applied "about February 2." As neither the Administrative Law Judge ("ALJ") nor the Board found that she had applied *on* February 2, we do not include her among those who applied on February 2.

4. These former strikers generally attempted to apply at the courtesy booth; seven established that they spoke with an identified supervisor.

5. The Board's opinion states that sixty employees were hired over the next *seven* months, but this

appears to be a miscalculation. 313 N.L.R.B. at 621. In its brief, the Board uses the correct figure in stating that these hires took place over the next *nineteen* months. Board Brief at 11.

6. Arriaga, a third striker, submitted an application and spoke to Schroat in August, 1983, after learning that there were meat department vacancies. Schroat told her that he would contact her if there was an opening, but she was never contacted. At the hearing, Schroat testified that he did not have any subsequent full-time openings. Tr. 462. The Board did not expressly find that this was pretextual.

received special treatment denied to the former strikers, and (3) if so, why the Board did not consider whether a legitimate business preference for incumbent employees might explain this disparate treatment. *See id.* at 1360–61. Finally, we sought further justification for the extension of relief to those former strikers who did not attempt to file until after the February 2 deadline and to those who never attempted to file at all, expressing our doubt about the Board's rationale that such attempts would have been futile. *See id.* at 1361–62.

On remand, the Board again concluded that Southwest had violated §§ 8(a)(1) and (3) of the Act by refusing to hire the former strikers and stood firm on the scope of its original remedial order. 313 N.L.R.B. 616, 617, 622, 1993 WL 513145 (1993). The Board responded to the concerns raised in our first opinion as follows. First, it clearly disavowed any attempt to hold Southwest to any obligations to favor Handy Andy's former employees in hiring, whether former strikers or not; its sole obligation was *not* to discriminate against any applicant on the basis of Labor Act protected conduct. *Id.* at 618. *Second,* it expressly inferred that Southwest "could not have achieved its hiring goals without according the predecessor's terminated employees special consideration in putting together its work force, and second, that it denied the strikers this consideration based on their protected activity." *Id.* at 620. *Third,* the Board explained that in determining whether the disparity could be justified by a legitimate business reason, it would consider only those reasons actually advanced by the employer. *Id.* at 617 n. 7. Finally, the Board agreed with this court that there was not evidence to support an extension of the remedial order to those who had applied late or not applied at all on the grounds of futility. *Id.* at 622. It concluded, however, that, if not for Southwest's discriminatory conduct in designing and implementing its hiring process, both the late- and non-filers would have been hired. Thus, the remedy should be extended to them. *Id.*

Section 8(a)(3) of the National Labor Relations Act makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). An employer violates § 8(a)(3), and thereby § 8(a)(1), which makes it an unfair labor practice "to interfere with, restrain, or coerce in the exercise of rights guaranteed" in the Act, 29 U.S.C. § 158(a)(1), if it declines to hire a person because of his union membership or activity. *See* 943 F.2d at 1359 (collecting cases). In determining whether an employer has committed such a violation, the Board employs the test first articulated in *Wright Line,* 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).[7] Under the *Wright Line* test, the General Counsel must first make a *prima facie* showing sufficient to support an inference that the employee's protected conduct was a "motivating factor" in the employer's decision. The burden then shifts to the employer to demonstrate that it would have taken the same action even if the employees had not engaged in the protected activity. *See* 943 F.2d at 1359; *Wright Line,* 251 N.L.R.B. at 1089.

In *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983), the Supreme Court upheld the Board's allocation of the burden of proof in the *Wright Line* test. In the course of so holding, the Court stated that § 7(c) of the Administrative Procedure Act ("APA"), which provides that "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof," 5 U.S.C. § 556(d), "determines only the burden of going forward, not the burden of persuasion." 462 U.S. at 403–04 n. 7, 103 S.Ct. at 2475 n. 7. In *Office of Workers' Compensation Programs v. Greenwich Collieries,* —— U.S. ——, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994), the Court overruled this interpreta-

---

**7.** The Board uses the *Wright Line* test in both "dual motive" cases—in which the employer acts with a legitimate and an illegitimate motive and the purpose is to determine whether the legiti-

mate motive would have caused the action on its own—and in "pretext" cases, where the employer's purported legitimate basis for action is not a factor at all.

tion of § 7(c) of the APA, holding that § 7(c) does, indeed, determine the "burden of persuasion," and thus requires that that burden remain at all times with the proponent of the rule or order. Nevertheless, the Court held that the burden to mount an *affirmative defense* could rest on the party opposing the order, and concluded that the Board's *Wright Line* test was permissible because it does no more than impose the burden of proving an affirmative defense on the employer. "The NLRB's approach in *Transportation Management* is consistent with § 7(c)," the Court concluded, "because the NLRB first require[s] the employee to persuade it that antiunion sentiment contributed to the employer's decision. Only then did the NLRB place the burden of persuasion on the employer as to its affirmative defense." ——— U.S. at ———, 114 S.Ct. at 2258.

█ Reading *Greenwich Collieries* and *Wright Line* together, then, the General Counsel bears the burden of demonstrating that the employer acted with discriminatory motive throughout the case. Although the Board labels the General Counsel's burden that of establishing a *"prima facie"* case, it has, in fact, traditionally required the General Counsel to sustain the burden of proving that the employer was motivated by antiunion animus.[8] The General Counsel may, of course, use the employer's own response to the charges as part of his evidence of antiunion animus. As the Board explained in *Wright Line*, "[t]he absence of any legitimate basis for an action"—*i.e.*, the absence of a credible explanation from the employer— "may form part of the proof of the General Counsel's case." *Id.* at 1088 n. 12. In so stating, the Board pointed to the Ninth Circuit's decision in *Shattuck Denn Mining Company v. NLRB*, 362 F.2d 466 (9th Cir. 1966), in which the court concluded that:

> If [the trier of fact] finds that the stated motive for a discharge is false, he certainly can infer that there is another motive. More than that, he can infer that the motive is one that the employer desires to

conceal—an unlawful motive—at least where, as in this case, the surrounding facts tend to reinforce that inference.

*Id.* at 470; *cf. Barbour v. Merrill*, 48 F.3d 1270, 1277 (D.C.Cir.1995) (Under the Title VII framework, "a factfinder's rejection of the employer's nondiscriminatory reasons, while not sufficient to *compel* a finding of discrimination, nonetheless suffices to *permit* such a finding.") (emphasis in original) (citing *St. Mary's Honor Center v. Hicks*, —— U.S. ———, ———, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)).

Applying this framework, the Board concluded that the General Counsel had made out a *"prima facie"* case that Southwest had discriminated against the former strikers in the design and implementation of its hiring process by (1) refusing to provide applications to five of the six former strikers who attempted to apply on February 2 and refusing to accept applications from all but two of the former strikers who attempted to apply thereafter, and (2) denying employment on pretextual grounds to two of the former strikers who did file applications. 313 N.L.R.B. at 620–22.

In rebuttal, Southwest argued that it denied employment to the former strikers solely because they failed to submit an application on February 2 and, as to those who applied late, that it did not hire them because they had poor work records. More generally, Southwest had shifted to a hiring policy preferring internal promotion. Southwest offered no explanation for the lack of success of former strikers who tried and failed to get their applications in on February 2.

The Board concluded that Southwest had failed to meet its burden of establishing a nondiscriminatory basis for the treatment of the strikers. The Board rejected the company's explanation that the poor fortune of the former strikers could be traced to the brevity of the one-day hiring process itself, inferring instead that Southwest actually designed this

---

**8.** Presumably, in the wake of *Greenwich Collieries,* it will no longer be appropriate to term the General Counsel's burden that of mounting a *prima facie* case; his burden is to persuade the Board that the employer acted out of antiunion animus. The Board, of course, decided this case before *Greenwich Collieries,* and neither party has argued that *Greenwich Collieries* should affect our analysis.

hiring process to ensure that no former strikers even made it into the applicant pool. To support this conclusion, the Board reasoned like this.

*First,* the Board noted that Southwest's only stated hiring goals for the meat department were to staff the stores with "the best productive people," who were "already known and that had been previously employed by us." Southwest's one-day, public hiring process, with no special prior notice to Handy Andy's experienced employees, bore no rational relation to its announced goal of hiring employees with good production records and past experience with the predecessor company. Thus, the Board deduced, the company's *real* purpose must be an illicit one of deterring applications from the former strikers: because "the public hiring procedure is so antithetical to [Southwest's] stated goals ... we can only conclude that, at least with respect to the meat department, the procedure was a sham intended to prevent or discourage the filing of applications by the strikers." 313 N.L.R.B. at 620.

*Second,* the Board looked to the actual implementation of the one-day hiring and concluded that it did not, in fact, operate neutrally vis-a-vis strikers and nonstrikers. Southwest hindered some former strikers from entering the applicant pool by denying them applications. Moreover, the Board inferred that Southwest secretly alerted incumbent employees to file timely applications. The Board based this inference on the unexplained yet overwhelming rate of incumbent employees who submitted timely applications, in contrast to the scarce numbers of former strikers among the applicants. The Board surmised from this disparity that "the application procedure was ... weighted toward the predecessor's employees in some manner." In particular, the Board "infer[red] that some former employees of the predecessor's meat department were called by agents of [Southwest] and told about the 1-day application procedure, urged to come

into the stores and apply for the jobs, and that these calls explain why the 1-day hiring process resulted in a work force composed entirely of the predecessor's former employees but no strikers." 313 N.L.R.B. at 622.[9]

With respect to Southwest's hiring *after* February 2, the Board was skeptical about Southwest's justification for its continued failure to hire or consider strikers as new jobs opened up, noting that Southwest had not "offered any evidence to support [its] contention" "that 'many' of these positions were filled by converting part-time employees ... to full-time status.... Neither does it claim that all these positions were filled in this manner." 313 N.L.R.B. at 621.

Concluding that the General Counsel "established a strong prima facie case to support the allegations that [Southwest] discriminated against the strikers for their protected activity" and that Southwest "has provided no plausible rationale for its course of action," the Board concluded that Southwest violated §§ 8(a)(1) and (3). 313 N.L.R.B. at 621.

### III. DISCUSSION

#### A. *Standard of Review*

In reviewing the Board's decision, we must uphold any of the Board's factual findings that are supported by substantial evidence, *see* 29 U.S.C. § 160(f), and "[w]e owe substantial deference to inferences drawn from these facts." *See Caterair International v. NLRB,* 22 F.3d 1114, 1120 (D.C.Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 575, 130 L.Ed.2d 491 (1994); *Avecor Inc. v. NLRB,* 931 F.2d 924, 928 (D.C.Cir. 1991), *cert. denied,* 502 U.S. 1048, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992). Further, the ALJ's credibility determinations, as adopted by the Board, are binding unless "patently without basis in the record." *Caterair,* 22 F.3d at 1120.

9. The Board found that "agents of [Southwest]" notified incumbent employees of the one-day hiring process but declined to "second-guess the judge by finding that either Schroat or Tamez was untruthful." 313 N.L.R.B. at 622. In fact, the ALJ neither credited nor discredited

Schroat's and Tamez's testimony that no notice was given to the incumbents. The ALJ did, however, conclude that Schroat was "untruthful" in other matters. *See, e.g.,* ALJ Decision, slip op. at 14 ("I do not credit Schroat's alleged basis for denying employment to Danmon and Huerta.").

B. *Issues on Remand to the Board*

In our first opinion in this case, this court asked the Board to explain (1) whether it was holding Southwest as a successor employer to any hiring obligation beyond that of refraining from discrimination against applicants on the basis of their union membership or activity, (2) whether it had inferred that Southwest had secretly favored incumbent employees, and (3) if so, why it had not considered legitimate explanations for such a preference. 943 F.2d at 1360–61. The Board has addressed each of these concerns in its decision on remand.

First, with regard to the theoretical underpinning of the Board's initial decision, it appeared to us that, instead of finding actual antiunion discrimination and ordering reinstatement on that ground, the Board might have "rest[ed]" its opinion "upon an unarticulated assumption that a successor has a special obligation to favor the employees of its predecessor, or at least to treat them all the same way." 943 F.2d at 1360. On remand, the Board made clear that it was not acting on the basis of a heightened obligation of a new owner toward its predecessor's employees. Rather it "look[ed] to the General Counsel to demonstrate that [Southwest's] failure to hire any strikers was motivated by discriminatory intent." 313 N.L.R.B. at 618. The Board made explicit its reliance in this case on the classic *Wright Line* inquiry: whether Southwest failed to hire the former strikers because of their participation in an economic strike against Handy Andy.

Second, the Board expressly inferred that Southwest had weighted the application process toward incumbent employees. Whether substantial evidence supports this inference, we discuss at more length below.

■ Third, in response to this court's concern that the Board had failed "to consider obvious alternative explanations for the Employer's hiring as and whom it did," 943 F.2d at 1361, such as Southwest's familiarity with the incumbents, the Board explained that it would only consider "those arguments and business justifications actually placed before us by [Southwest]," 313 N.L.R.B. 617 n. 7, and the "incumbent familiarity" justification was not among these. The Board's position

in that regard is, in fact, entirely consistent with its *Wright Line* framework: once the General Counsel makes a case sufficient to support an inference of antiunion discrimination, the *employer* bears the burden of demonstrating that it would have taken the same action regardless of the employees' protected activity—in this case, that it would have declined to hire the former strikers without regard to their participation in the strike. Thus, the Board acted well within its discretion by only considering alternative explanations actually advanced by the employer.

With respect to the causes of remand, then, we are satisfied by the Board's response on the first and third.

C. *Substantial Evidence*

■ Remaining is the need for an assessment of whether there is substantial evidence to support the Board's inference that Southwest gave special consideration to incumbent employees because it was motivated by antiunion animus. Southwest vehemently disputes that inference. Upon review of the record, however, we conclude that the Board's finding passes muster.

■ The Board inferred that both the design and the implementation of the hiring process were motivated by discrimination. Thus, it appears to have concluded that the one-day process was *devised* with the objective of preventing strikers from entering the applicant pool. We are not persuaded there is enough evidence in the record for the Board to make the inference that the conscious objective of the one-day hiring system was to prevent the former strikers from entering the applicant pool. There was, in fact, no direct testimony on the purpose of the one-day hiring process. Schroat and Simmons, two of Southwest's supervisors, who did not themselves formulate the plan but were merely informed of it, certainly did not speak to its purpose. Simmons said he considered the process to be "an opportunity to get rid of nonproductive employees." Tr. 392. Tamez, who *was* one of the officials responsible for designing the process, did not testify as to why the time period for accepting applications was so short; nor was he

asked to. In truth, Southwest was never pressed to explain the genesis of the one-day process and we think it a stretch on this record to infer an illicit motive as *the* animating purpose of that process.

The Board's second inference, that the process, for whatever reasons designed, did not operate neutrally, despite Southwest's protestation to the contrary, fares better. The Board found the process was "weighted toward the predecessor's [current] employees in some manner." 313 N.L.R.B. at 622. Indeed, in our first opinion, we clued that "[t]he Board might have inferred from evidence of personal notification to some grocery employees, and from the large number of meat department incumbents hired, that some meat department incumbents must also have been called." 943 F.2d at 1360. This time round, the Board made that inference explicit, and we believe it is supported by substantial evidence in the record as a whole. At least seventy-seven incumbent employees were able to pass the hurdles of the hiring process, whereas only seven of the twenty-four former strikers found out about it in time to apply on February 2, and only one of them was allowed actually to submit her application. In grocery department hiring, furthermore, Southwest officials acknowledged that they directly notified and elicited applications from incumbent workers. Finally, none of Simmons's meat department incumbents submitted applications at their own store, the most likely place for them to appear absent special instructions, suggesting that they may have been notified to submit applications elsewhere. The overwhelming success of the incumbents in contrast to the strikers in obtaining jobs on February 2 and Southwest's admitted practice of notifying grocery employees in advance that they should submit applications that day provides an adequate basis for the Board's inference that meat department employees received similar special consideration.

The Board was also justified in concluding that this "special consideration" reflected an antiunion animus. In the face of ALJ-credited testimony that five former strikers were refused applications on February 2 by supervisors, Southwest has declined to offer any explanation for this odd circumstance. It resolutely stands by its prior assertion that its policy was to accept applications from anyone during that fateful day, and that no meat department positions were filled until evening. Its challenge to the ALJ's settled finding of fact that these former strikers sought applications on the second of February is not convincing.[10]

Similarly, rather than advancing a nondiscriminatory reason for the fact, as found by the Board, that the application process was weighted toward incumbent employees, Southwest has simply stood fast in its denial of any preference. As our prior opinion noted, an employer might well have legitimate business reasons for preferring incumbent employees and tilting its application process toward those employees.[11] Thus, had Southwest acknowledged that it took action to insure that incumbent meat department employees knew about the one-day application process because it preferred employees who "had recent experience in working together at the same stores" and were "familiar" to

---

**10.** Each of the five strikers testified that he sought to apply on February 2, 1983. Before the ALJ and again on appeal, Southwest attempted to discredit the testimony of several of the strikers by arguing that the actual status of the store on February 2 was different from their description. (For example, while several of these former strikers stated that the store was "open for business" when they applied, Southwest argued the stores were open only to accept applications, and not, technically, "for business".) In every case, the ALJ resolved the dispute in favor of the striker, and we defer to that resolution as conclusive. *See Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 953 (D.C.Cir.1988) ("Board-approved credibility determinations of an ALJ are entitled to be upheld unless they are hopelessly incredible or self-contradictory.") (internal citation and punctuation omitted), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989).

**11.** In this regard, as the dissent points out, Southwest had no "obligation to *seek out* the strikers for employment," Diss. Op. at 1347, and we do not understand the Board to be asserting such an obligation. *See* 313 N.L.R.B. at 619. Rather, as we read the decision, the Board's position is not that Southwest had a duty to notify the strikers of jobs—or otherwise seek them out—but that it had a duty *not* to deny the strikers notice for discriminatory reasons, and that it did so deny them in this case.

current supervisors, 943 F.2d at 1360, it would have gone a ways toward dissipating any inference of antiunion animus as the motivation for what happened on February 2. As the Board found, however, Southwest never acknowledged anything like that:

> [Southwest] has never argued that it had a preference for those at work on the predecessor's last day; only that its criteria were *previous employment with the predecessor*, a credential each striker possessed, *and a good record*, a credential many of the strikers possessed.

313 N.L.R.B. at 619 (emphasis in original). Southwest's avowed criteria of past experience and a good record was, by Southwest's own admission, met by at least some of the strikers and suggests no basis for distinguishing between incumbent employees and former strikers. Southwest, then, gave the Board no opportunity to consider nondiscriminatory reasons for the weighting of the application process toward incumbents. Moreover, Southwest's steadfast denial that it gave notice or other advantages to the incumbents gives rise to an inference that Southwest has been less than candid about its hiring process. This lack of candor, in turn, contributes to the credibility of the Board's inference of illicit antiunion motive.

The Board's inference of discriminatory intent gains additional support from the finding that Southwest refused to hire the two strikers who did submit applications for pretextual reasons. From Schroat's vague and shifting testimony about (1) whether the former strikers were even eligible for the post-February 2 vacancies, and (2) if so, why they weren't selected, the Board could reasonably infer that the company's explanations were pretextual and shielded an illicit motive. *Cf. EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir.1994) (under Age Discrimination in Employment Act, jury can infer pretext and thus discrimination where employer provides shifting and inconsistent explanations for its action).

In sum, although we find the Board's inference that Southwest *designed* the one-day application process in order to disqualify former strikers from consideration unsupported by substantial evidence, we find its inference that Southwest implemented the one-day process in a discriminatory manner and with a discriminatory motive supported by evidence substantial enough to sustain the unfair labor practice finding.

## IV. REMEDY

■ On limitless occasions we have reiterated the large measure of deference we owe to the Board's selection of remedy. "In fashioning its remedies under the broad provision of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1940 n. 32, 23 L.Ed.2d 547 (1969); *see also Caterair*, 22 F.3d at 1120; *Avecor*, 931 F.2d at 928. Nevertheless, "a proposed remedy [must] be tailored to the unfair labor practice it is intended to redress," *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 900, 104 S.Ct. 2803, 2813, 81 L.Ed.2d 732 (1984), and must be designed to "restor[e] the economic status quo that would have obtained but for the company's wrongful [action]," *NLRB v. J.H. Rutter–Rex Mfg. Co.*, 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969).

■ In its first opinion, the Board granted relief to all the former strikers—the timely, late, and non-filers alike—on the grounds that it would have been futile for the late- and non-filing strikers to attempt to make timely applications, since the system was tainted to begin with. In the prior panel opinion, we questioned this rationale because the Board had found neither that Southwest had taken any action which would lead the former strikers to believe that applying would be futile, nor that the strikers actually believed it to be futile.

On remand, the Board abandoned its futility rationale, agreeing that "while, as an objective matter, it would have been futile for employees to apply, there is little or nothing to demonstrate that was the reason that these former strikers did not apply or did not do so on February 2." 313 N.L.R.B. at 622. It nevertheless maintained the original scope

of its order and relief. It does not elaborate on any new theory for this remedy, but simply "note[s]" that, "with respect to those who applied ... after February 2 ... [Southwest] hired 60 meat department employees after February 2," and, "with respect to those who never applied, ... the Union has made a request for reinstatement for all strikers ... and [Southwest] hired some employees in other departments without application." 313 N.L.R.B. at 622.

In our first opinion we speculated on possible alternative grounds for the Board's extension of its reinstatement and backpay remedy to the late-filers: the Board might have "implicitly relied upon [the late-filers'] lack of notice regarding the application procedure" in granting relief to them, but we also noted that the Board had not specifically advanced this explanation and had not "expressly made the necessary factual finding—that concealment is what prevented each striker, other than those who did attempt to apply on February 2, from making timely application." 943 F.2d at 1362. This time, although the Board is terse on the theory underlying its remedy,[12] the finding that Southwest's discriminatory conduct prevented the late-filers from submitting timely applications is implicit in its decision. In that decision, the Board explicitly infers that the former strikers were discriminatorily denied special notice granted to the incumbent employees, and that the preferential notice to incumbent employees "explain[s] why the 1-day hiring process resulted in a work force composed entirely of the predecessor's former employees but no strikers." 313 N.L.R.B. at 622. Given this basis for the Board's finding of discrimination, we can think of no remedy more "tailored to the unfair labor practice it is intended to redress," *Sure–Tan,* 467 U.S. at 900, 104 S.Ct. at 2813, than a remedy that assumes that the former strikers *had* been given comparable advance notice to the incumbents. Acting on this assumption, the Board could reasonably conclude that the late-filers—all of whom attempted to apply in the same month of February—would have submitted timely applications if given notice. Whether they would have been hired is, of course, another question, but Southwest itself has acknowledged that there were "good prospects" among the strikers, and, once the General Counsel has persuaded the Board that Southwest was motivated by antiunion animus, it is Southwest that bears the burden of establishing that it would not have hired the former strikers even absent this animus. In this regard, we note that Southwest has, to date, only contested the employability of the two former strikers who actually filed applications, Danmon and Huerta. In similar cases in which the Board orders reinstatement for a whole class of employees, it has explained that its policy is to allow the employer "the opportunity to show that particular ... employees are unsuitable for rehire" during the compliance proceeding, and we trust that the Board will follow this policy here. *Great Lakes Chemical Corp. v. NLRB,* 967 F.2d 624, 629 (D.C.Cir.1992); *see also United Food & Commercial Workers Int'l Union, Local 152 v. NLRB,* 768 F.2d 1463, 1476 (D.C.Cir.1985) (remedy of reinstatement for prior work force "would still allow the employer in the course of compliance proceedings to assert any legitimate defenses in individual cases"); *Packing House and Indus. Serv., Inc. v. NLRB,* 590 F.2d 688, 698 n. 12 (8th Cir.1978) (an employer must "have an opportunity to assert all recognized defenses related to compliance hearings"). Accordingly, we conclude that the Board was within its discretion in granting the remedy of reinstatement and backpay to the late-filers as well as those who made timely applications.

We conclude, however, that there is no basis to extend the remedy to the three former strikers who never submitted applications at all.[13] Since they *never* filed applica-

---

**12.** Although the Board "note[s]" that Southwest hired sixty employees after February 2, this observation does not appear to be the basis for its remedial order. We, in turn, are hesitant to rely too heavily on the fact that Southwest filled positions after February 2, because the Board's inferences of discrimination derive largely from Southwest's February 2 hiring process and not from its hiring practice thereafter.

**13.** The Board's opinion identifies these three as Shirley Walker, Roger Wendel, and Alice Arriaga. 313 N.L.R.B. at 622. In fact, the ALJ found

tions, even upon learning of Handy Andy's sale, there is no basis in the record from which to conclude that they would have filed applications if they had learned of the opportunity on February 2. Though the February 2 deadline had already passed by the time they likely learned of the sale, this fact did not deter other strikers who filed late, and the Board has already concluded that "there is little or nothing to demonstrate ... that these former strikers did not apply" because they believed it would be futile. 313 N.L.R.B. at 622.

Instead, the Board suggested that the Union's requests that all the former strikers be reinstated—made in November, 1992, and June, 1993—established that Southwest's management *knew* these former strikers wanted jobs,[14] and concluded that, absent discrimination, Southwest would have sought out these former strikers, as it did the grocery incumbents. Without any evidence in the record that Southwest hired *any* meat department employees who had not submitted applications, however, we cannot agree with the Board that "but for [Southwest's] discriminatory plan, it would have hired strikers even if they did not apply." 313 N.L.R.B. at 622. Thus, we conclude that extension of the remedy to the three non-filers exceeds the Board's authority to "restor[e] the economic status quo that would have obtained but for the company's wrongful [action]." *Rutter–Rex*, 396 U.S. at 263, 90 S.Ct. at 420.

In the end, we enforce the Board's order granting reinstatement and backpay to the twenty-one former strikers who attempted to apply for jobs at some point in February—subject to Southwest's opportunity at compliance to assert any legitimate defenses to hiring particular individuals other than Danmon and Huerta—but we deny enforcement of the order with respect to the three former strikers who never submitted applications.

that it was Alice *Cabrera,* not Alice Arriaga, who never attempted to apply. ALJ Decision, slip op. at 5–6, 8.

**14.** The Board has disavowed reliance on a successorship theory in this case, and thus points to

## V. Conclusion

The Board's finding that Southwest discriminated against former strikers on the basis of their protected activity is supported by substantial evidence. We deny Southwest's petition for review except for modifying the remedial order so as not to apply to non-filers. To that extent, the Board's application for enforcement is granted in part and denied in part.

*So ordered.*

SILBERMAN, Circuit Judge, *concurring in part and dissenting in part:*

Stretching to its very limits that deference we owe the Board's factual inferences, I agree with the majority that the Board's finding concerning the six strikers who applied for jobs on February 2 is supportable. I also agree that the Board's finding that Southwest's one-day-only hiring technique was "designed" to circumvent applications from strikers is not supported by substantial evidence, since the general counsel failed to put on any testimony directed to this point. Nor did the general counsel sustain his burden of showing that the strikers who applied subsequently during the month of February were ever discriminated against *with respect to their applications,* since no evidence was produced to show that there were vacancies for outside hires at the time those applications were received. The majority does not rest its opinion on a contrary determination.

The majority would instead affirm the Board's finding of discrimination as to the post-February 2 striker applicants (but not as to those who never applied) on the theory that the Board legitimately inferred that Southwest had notified incumbent employees about the hiring date but did not so notify the strikers—for discriminatory reasons. According to the majority, if the strikers who eventually applied had known about the one-day hiring period, they would have applied on February 2, and would have been rejected

the Union's request for reinstatement only to establish that Southwest had *knowledge* of the former strikers' interest, not to establish any legal duty on the part of Southwest.

as had the others. The Board based its decision on its factual determination (quoted by the majority) that the hiring process was "weighted toward the predecessor's employees in *some* manner" and its "infer[ence] that some former employees of the predecessor's meat department were called by agents of the Respondent and told about the 1-day application procedure, urged to come into the stores and apply for jobs." Maj. Op. at 1340–41 (emphasis added) (quoting 313 N.L.R.B. at 622).

The Board, however, did not rely on the majority's logic to extend its discrimination finding to the post-February 2 striker applicants. It said that

> the Respondent hired 60 meat department employees after February 2. No striker was hired. With respect to those who never applied, we note that the Union had made a request for reinstatement for all strikers, and thus the Respondent *knew* that they all wanted to work for it. In addition, the Respondent's policy was to hire experienced employees. Finally, we note that the Respondent hired some employees in other departments without application. However, it *failed* to extend that privilege to strikers.

313 N.L.R.B. at 622 (emphasis added). In other words, the Board is essentially sticking to its theory, notwithstanding our earlier remand, that the employer had an obligation to *seek out* the strikers for employment. The Board regards Southwest's failure to do so as the crucial evidence of discrimination. Only for this reason would Southwest's *knowing* that the strikers were willing to work matter. The majority rightfully eschews endorsing that notion but instead "reinterprets" the Board's opinion to have made a finding that the company discriminatorily declined to *notify* the strikers as to the one-day hiring opportunity.

I think it is a fair inference that incumbent employees had superior information than did *any* and all nonincumbents, but as is well known with or without expertise, information of this kind has a way of being shared among employees in an organization even against the wishes of management (it is often called scuttlebutt). In this case, the ALJ and the Board specifically credited the testimony of Southwest's managers who stated that they had not given preferential notice to incumbent workers.* On the other hand, a good number of persons in the community who were not incumbent employees—including a significant proportion of the strikers—managed to gain information about Southwest's hiring plan. In short, that it came to be known to most incumbents and others in the community that Southwest would begin taking applications on February 2 simply is not evidence that Southwest's *management* ever deliberately notified anyone.

Furthermore, even if Southwest had preferred incumbents to *all* nonincumbents through notification or otherwise, that would not be evidence of discrimination against strikers *qua* strikers. In that event, the strikers would have been treated precisely as were all other nonincumbents. Only if the Board had asserted a proposition that it has expressly disavowed—that Southwest owed a special duty to the strikers beyond the requirement that it treat them in the same manner as it treated nonstriker nonincumbents—could a discrimination theory be based on the company's failure specifically to notify the strikers of the February 2 hiring.

The difficulty with the Board's position is that the general counsel never made out a *prima facie* case that Southwest had discriminated against the post-February 2 applicants. Evidence of a general antiunion animus is certainly by itself not adequate to show discrimination against any particular employee. *Power, Inc. v. NLRB*, 40 F.3d 409, 417–18 (D.C.Cir.1994); *Synergy Gas Corp. v. NLRB*, 19 F.3d 649 (D.C.Cir.1994) (citing *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 395, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983)). The burden to present an affirmative defense therefore nev-

---

* The Board stated:

> We find that the pertinent testimony is that the Respondent's witnesses did not themselves contact any meat department employees or know of any contact of meat department employees before the 1-day hiring process and we will not second-guess the judge by finding that either Schroat or Tamez was untruthful.
>
> 313 N.L.R.B. at 622.

er shifted to Southwest. *Compare* Maj. Op. at 1343–44. The murkiness of the record and the impreciseness which marks both Board decisions in this case simply reflect a failure of proof. The majority analyzes the question whether the Board's finding of discrimination against the post-February 2 striker applicants is supportable as if it were a remedial issue, subordinate to the Board's finding of discrimination against the February 2 applicants. *See* Maj. Op. at 1345. But that approach simply will not work. The Board is obliged to find that Southwest discriminated against the post-February 2 applicants as well as the February 2 applicants. And we must test that subsequent finding for substantial evidence just as we did the former. *Compare Power, Inc.*, 40 F.3d at 417–20; *Synergy Gas*, 19 F.3d at 651–53.

This is a difficult case—I suspect because the Board, drawing upon its expertise, is rather certain that this employer deliberately did *something* to exclude strikers from new employment opportunities. I am by no means unsympathetic to the Board's conviction. I, too, strongly suspect that Southwest somehow did that which the Board believes. But there is simply not substantial evidence to prove it, and neither the Board's fixed determination, notwithstanding our remand, nor the majority's imaginative reading of the Board's decision will fill the gap.