United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 10, 1997 Decided January 16, 1998 

 No. 97-1068

 W.C. McQuaide, Inc., 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondent

 On Petition for Review and Cross-Application

 for Enforcement of an Order of the

 National Labor Relations Board

 Michael A. Taylor argued the cause for petitioner, with 
whom Celeste M. Wasielewski was on the brief.

 Marion Griffin, Attorney, National Labor Relations Board, 
argued the cause for respondent, with whom Linda R. Sher, 
Associate General Counsel, and Aileen A. Armstrong, Deputy 


Associate General Counsel, were on the brief. John D. 
Burgoyne, Assistant General Counsel, entered an appearance.

 Before: Edwards, Chief Judge, Ginsburg and Rogers, 
Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: Petitioner W.C. McQuaide, Inc. 
seeks review of a decision and order of the National Labor 
Relations Board finding that the company had violated sec-
tions 8(a)(3),(4), and (1) of the National Labor Relations Act 1 
by discriminating against sixteen employees because they 
engaged in union activity, and against three employees be-
cause they initiated or testified in Board proceedings. The 
company contends that the Board failed to give appropriate 
consideration to the company's Wright Line 2 defenses to the 
section 8(a)(3) allegations, which it argues exonerated it for 
acting against employees who would have been subjected to 
discipline regardless of their union activities. The company 
maintains that the administrative law judge ignored evidence, 
ruled that several employees had been constructively dis-
charged although the complaint had not included such an 
allegation, and made credibility determinations that were 
unsupported by the record. Because we conclude, with one 
exception, that the company's challenges to the Board's deci-
sion and order are unpersuasive, we grant the petition in part 
and deny the petition in part. Conversely, we grant the 
Board's cross-petition for enforcement of its order in part and 
deny it in part.

 I.

 McQuaide is a family-owned and operated interstate truck-
ing and warehousing business. The company has successfully 
resisted attempts to unionize its employees in the past, and 
was found to have engaged in unfair labor practices on one 
prior occasion. The instant charges arose out of McQuaide's 

__________
 1 See 29 U.S.C. s 158(a)(1),(3),(4) (1988).

 2 Wright Line, 251 N.L.R.B. 1083 (1980), enf'd on other 
grounds, 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 
(1982).


most recent efforts to maintain a union free shop. The 
company does not contest the Board's finding that it violated 
section 8(a)(1) by repeatedly threatening reprisals and dis-
charges against employees for supporting the union, by coer-
cively interrogating employees about their union activities, by 
creating the impression that employee's union meetings were 
under surveillance, by preventing one employee from wearing 
a union insignia and passing out union cards, and by telling 
employees that a wage increase depended on their defeat of 
the union or withdrawal of unfair labor practice charges. 
Therefore, we summarily enforce the Board's order with 
respect to these charges. See Grondorf, Field, Black & Co. v. 
NLRB, 107 F.3d 882, 885 (D.C. Cir. 1997); Intl. Union of 
Petroleum & Indus. Workers v. NLRB, 980 F.2d 774, 778 n.1 
(D.C. Cir. 1992).

 As to the remaining charges, we need only address two 
because the company's other challenges are met by sufficient 
evidence in the record to support the Board's findings.3 
Those charges involve discharged McQuaide employees Tom 
Boyes, Jack Boyes, and Dale Salsbury.4

 An employee's discharge violates section 8(a)(3) when the 
employee's union related activities were a motivating factor in 
the employer's decision. See MECO Corp. v. NLRB, 986 
F.2d 1434, 1436 (D.C. Cir. 1993). Under the Wright Line 
test, the General Counsel of the Board must first make a 
prima facie showing of the employer's unlawful motivation. 
As an affirmative defense, the employer then bears the 
burden of demonstrating "that it would have taken the same 

__________
 3 In reviewing the Board's decision, this court must uphold any 
factual finding that is supported by substantial evidence on the 
record considered as a whole, see 29 U.S.C. s 160(f) (1988), and the 
court "owe[s] substantial deference to inferences drawn from these 
facts." Caterair Int'l v. NLRB, 22 F.3d 1114, 1120 (D.C. Cir. 1994).

 4 McQuaide does not contest that it violated section 8(a)(3) and 
(1) by suspending employees Tom and Jack Boyes in January 1992 
and by denying two days' work to Tom Boyes in March-April 1992. 
We accordingly summarily affirm the Board's order in those re-
spects as well. Grondorf, Field, Black & Co., 107 F.3d at 885.


action even if the employee[ ] had not engaged in the protect-
ed activity." Southwest Merchandising Corp. v. NLRB, 53 
F.3d 1334, 1339 (D.C. Cir. 1995). McQuaide does not contend 
that the General Counsel failed to meet its burden of proving 
that McQuaide had a discriminatory motive for discharging 
Jack Boyes, Tom Boyes, or Dale Salsbury. Rather, the 
company maintains that the ALJ and the Board failed to give 
adequate consideration to its Wright Line defenses, and that 
the findings that the company's proffered reasons for the 
discharges were merely pretextual were not supported by 
substantial evidence.

 II.

 Jack Boyes worked at McQuaide's Richfield, Ohio satellite 
facility with his father Tom Boyes and another employee, 
Dale Salsbury. On the night of August 12-13, 1992 Jack 
Boyes was scheduled to drive a "shuttle" truck from the 
Richfield terminal to McQuaide's headquarters in Johnstown, 
Pennsylvania, but failed to report for work. He did not notify 
the night dispatcher of his absence and apparently never 
contacted the company again. The dispatcher attempted to 
contact Jack Boyes by telephone and radio when he realized 
that Jack was not coming in, but was unsuccessful. On 
August 14, the company's vice president of operations in-
formed Tom Boyes that Jack Boyes had been terminated 
because he had never called in to work.

 At the hearing before the administrative law judge 
("ALJ"), Jack Boyes testified that he had notified the dis-
patcher of his absence and that he had also telephoned the 
vice president to explain that he had been ill that night. He 
claimed that the vice president told him that he was fired 
because of his excessive absenteeism. The ALJ, however, 
discredited this testimony because it was not corroborated by 
the company's telephone records and contradicted the "frank" 
testimony of the dispatcher. Nevertheless, the ALJ conclud-
ed that McQuaide terminated Jack's employment "in retalia-
tion for his active role in the Union's organizing drive." The 
ALJ based his finding on the shifting explanations offered by 


the vice president. Despite his initial contention that he fired 
Jack Boyes on August 13 for failing to report for work, the 
vice president testified that the company assumed Jack Boyes 
had abandoned his job after failing to hear from him for ten 
days. Because of these differing explanations, the ALJ con-
cluded that the company's explanation was merely pretextual. 
The Board affirmed the ALJ's finding without comment.

 In addition to the vice president's testimony, the company 
had offered evidence that it had discharged twenty-three 
other employees for failing to call in, consistent with a 
company policy requiring all drivers to contact the dispatcher 
if they are unable to work. The ALJ did not refer to this 
evidence in making his findings. Nor does the record permit 
the court to conclude that other evidence sufficed to refute 
this evidence without explanation. Although the company's 
description of its action with regard to the twenty-three 
employees is not as consistent as it suggests, inasmuch as its 
vice president admitted that some employees were given 
additional assignments after their first infraction of company 
policy, it remains unclear whether in Jack Boyes' case the 
firing was entirely pretextual.5 We agree with the company 
that whether Jack Boyes quit by not reporting for work or 
was discharged for failing to report to the dispatcher is 
merely a matter of semantics. Hence, the ALJ's reliance on 
the company's shifting explanations, without more, is flawed.

 Therefore, we remand this issue to the Board for further 
consideration of all of the evidence presented by McQuaide in 
mounting its Wright Line defense, including the evidence of 
past company practice. To rebut the evidence of McQuaide's 

__________
 5 Contrary to McQuaide's contention, the instant case differs 
from A & T Mfg. Co. v. United Steelworkers of America, 276 
N.L.R.B. 1183 (1985), where an employer met its Wright Line 
burden by establishing that the discharged employee had violated a 
rule requiring "employees to call in on days of absence." Unlike 
McQuaide, the employer in that case consistently followed a written 
rule that "specifie[d] discharge as the penalty for unreported ab-
sences." Id. at 1183. Furthermore, the employee had been 
discharged after repeatedly failing to report his absences, rather 
than on the basis of a single isolated incident.


unlawful motivation, the company still bears the burden of 
proving that it would have discharged Jack Boyes even if he 
had not engaged in union activities, see Southwest Merchan-
dising Corp., 53 F.3d at 1339, and we take no position on the 
correct understanding of the company's evidence nor whether 
it has met its burden.

 III.

 On February 18, 1993, McQuaide discharged the driver it 
had hired to replace Jack Boyes, leaving Tom Boyes and Dale 
Salsbury as the only drivers at its Norton, Ohio terminal.6 
The following morning, Tom Boyes called McQuaide's dis-
patcher to learn if there was any work for him that day.7 
The dispatcher told Tom Boyes that there was not, and that 
he did not know "what ... was going on," but instructed Tom 
to call the night dispatcher later in the day to see what had 
developed. Similarly Dale Salsbury telephoned the dispatch-
er on the evening of Friday, February 19 and was informed 
that the company "was not sending any freight out" to 
Norton. He was never told to check for work the following 
Monday or at any time thereafter. According to McQuaide's 
records, both Tom Boyes and Dale Salsbury were scheduled 
to work on Monday, February 22 but never reported in to the 
company. McQuaide's vice president testified that on the 
morning of February 23, he instructed the dispatcher to call 
the two drivers at their homes. Specifically, he told the 
dispatcher "Let's make sure we make an attempt to get a 
hold of these guys, so they can't say we didn't try to call 
them." The dispatcher testified that he left a message with 
an unidentified female at Tom Boyes' home and a message on 
Dale Salsbury's answering machine, asking each driver to 
return his call. Neither driver received these messages; nor 

__________
 6 McQuaide's Richfield satellite facility was relocated to Norton 
in early February 1993.

 7 Tom Boyes initially testified that he had called the dispatcher 
two other times on February 19 but later conceded that he called 
only once that morning. The ALJ also refused to credit Tom's 
testimony that he called the company on February 22.


did the company ever make another effort to contact them. 
The only remaining communication between the company and 
the drivers was a letter of termination, dated February 24, in 
which the company informed each driver that his record had 
been marked "Quit without notice."

 The ALJ and the Board rejected the company's defense 
that the two drivers had abandoned their jobs and concluded 
that McQuaide had "constructively discharged" Tom Boyes 
and Dale Salsbury on February 19 and 20, respectively, by 
withholding work from them. The ALJ considered the mes-
sages left for the drivers as a "perfunctory effort" to contact 
them which, coupled with the vice president's comment to the 
dispatcher, suggested that the calls were merely a pretense. 
Instead, the ALJ concluded that the company hoped that 
discontinuance of the flow of freight to Norton would encour-
age the two union activists to quit and moved quickly to 
conceal its tactics when the opportunity arose. In this re-
gard, the ALJ noted a statement made by McQuaide's presi-
dent earlier that autumn to the effect that the two drivers 
would not be around much longer because they were union 
supporters. The ALJ also emphasized that in the past the 
company had made far more of an effort to contact its drivers 
when they failed to appear for work. Furthermore, the 
company did not suggest in its messages that any work was 
waiting for Tom and Dale, only that they should return the 
dispatcher's call. Neither did the messages indicate that the 
drivers should call back by a certain date. The ALJ thus 
viewed the evidence as revealing a plot to set up Boyes and 
Salsbury so that they would leave their jobs, and the Board 
accepted his findings.

 McQuaide initially objects to the finding that Tom Boyes 
and Dale Salsbury were "constructively discharged" on the 
ground that the company was never charged with such a 
violation in the complaint. This contention is meritless. 
McQuaide was given a full and fair opportunity to litigate the 
nature of the two drivers' departure. Regardless of whether 
the company was found to have "discharged" or "constructive-
ly discharged" the two drivers, the evidence it proffered 
in defense was equally relevant. See Taylor v. FDIC, 


No. 96-5267, 1997 WL 791655, at *10 (D.C. Cir. Dec. 23, 1997) 
(quoting Katradis v. Dav-El of Wash., 846 F.2d 1482, 1485 
(D.C. Cir. 1988)). The company does not suggest that it 
would have offered any additional evidence or pursued a 
different litigation strategy if it had been charged with unlaw-
ful "constructive discharges." Therefore, the only question is 
whether the ALJ and the Board's findings that the two 
drivers had not voluntarily quit their jobs were supported by 
substantial evidence in the record.

 The drivers' behavior following their conversation with the 
dispatcher casts some doubt on the constructive discharge 
finding. Instead of calling in on February 22, Salsbury went 
to visit his daughter near Chicago and Boyes began working 
for a new employer after meeting with an NLRB investigator 
about prior charges he had filed against McQuaide. The ALJ 
seemed to excuse the drivers' actions by noting that they 
were never told by anyone at McQuaide to call in for work on 
February 22 or on any other day. But, if as McQuaide 
contends, standard company policy required the drivers to 
call in regularly, the fact that they were not instructed to call 
would be irrelevant. Moreover, Tom Boyes was told to call 
the night dispatcher on February 22 to check for work, but 
never bothered to do so. Hence, viewed in isolation the 
circumstances may suggest that both drivers abandoned their 
jobs and voluntarily quit. But the ALJ accepted the drivers' 
explanation that each had concluded that "McQuaide was 
shutting down its operations at Norton and effectively firing 
them," from their conversations with the dispatcher on Feb-
ruary 19. Thus, the reasonableness of this conclusion was 
critical to the ALJ's finding that Tom Boyes and Dale Sals-
bury were constructively discharged.

 The company contends on appeal that "[a]t most, [the 
drivers] were told there was no work available for them on 
February 19, 1993," not that there would be a prolonged work 
shortage. Yet the record shows that the dispatcher told 
Boyes that there was no work and he did not know what was 
going on. Further, Salsbury was told later that same day 
that no more shipments were being made to Norton, and was 
not told to call in for work at a later time. Still the company 


maintains that a reasonable person would not jump to the 
conclusion that he had been officially discharged upon hearing 
such news. The company contends that the drivers would at 
least have been expected to follow its "long-standing, well 
understood, and uniformly enforced dispatch procedure of 
requiring drivers to report in daily to dispatch." But, as we 
have noted, the company's call-in policy was not uniformly 
applied insofar as failures to report absences did not invari-
ably result in discharge. And the alacrity with which the 
company discharged these two drivers lends support to the 
ALJ's conclusion that its reasons were merely pretextual.

 Of particular significance to our conclusion that there is 
substantial evidence to support the Board's finding of con-
structive discharge is the fact that from the drivers' perspec-
tive it was clear what was happening because it had happened 
before: after McQuaide discharged Jack Boyes, the company 
shut down operations at the Richfield facility because the 
company claimed it could not operate the terminal with only 
two drivers.8 As a result, both Tom Boyes and Dale Salsbury 
were laid off for almost two months. The company maintains, 
nevertheless, that the two drivers could not reasonably have 
thought that operations at Norton were cut off indefinitely on 
February 19 because during the previous layoff both drivers 
had been personally told that the shuttle system was to be 
temporarily discontinued and had been offered continued 
employment in Johnstown. But a lot had happened since 
that time. Earlier in February the drivers had been laid off 
for approximately one week when the company temporarily 
moved the shuttle facility from Richfield to Columbiana, 
Ohio.9 Beginning in January 1992, Boyes and Salsbury had 

__________
 8 The ALJ rejected McQuaide's explanation for the layoffs 
because there was evidence that the company had been able to 
operate the terminal with only two drivers in the past. Thus, the 
ALJ concluded that these layoffs violated section 8(a)(3) and (1), 
and we find no error in this determination.

 9 Tom Boyes filed charges against McQuaide, claiming that he 
had been "constructively discharged" by the transfer to Columbiana 
because of his union membership, but the ALJ concluded that 


suffered a succession of layoffs and suspensions. Many of 
these incidents, the ALJ found, were unfair labor practices in 
reprisal for the drivers' union activities. Tom Boyes, for 
example, had been suspended without warning for three days 
for failing to cover for Jack Boyes on a night when Jack could 
not drive the shuttle, and Tom Boyes had been wrongfully 
denied wages on at least one occasion. McQuaide also had 
refused to allow both drivers to work for several days when 
they were one driver short, ostensibly because the company 
had no way to return a shuttle truck to Richfield from 
Johnstown. Finally, the drivers were well aware of the 
company's anti-union sentiments because its president told 
Tom Boyes when he hired him that "he would never employ a 
union driver behind the wheel of his truck," and later com-
plained to Tom that the Richfield drivers "were nothing but 
union trouble." By the time of their discharge they had seen 
two of their fellow drivers, who had been active union sup-
porters, let go and had seen McQuaide engage in various 
tactics for laying off other employees. Furthermore, nothing 
in the record indicates that the drivers had any reason to 
know that this time the company would promptly fill the third 
driver's position so that the Norton station could continue to 
operate.

 Under the circumstances reflected by the evidence before 
the ALJ, the Board could properly find that Boyes and 
Salsbury reasonably concluded that they were discharged 
when work was withheld from them on February 19. Con-
cededly, the question is close. But much of the conflict about 
what was said and what could reasonably be understood in 
the context of what had previously happened called for credi-
bility determinations that this court is ill-positioned to second-
guess. "The ALJ's credibility determinations, as adopted by 
the Board, are binding unless 'patently without basis in the 
record.' " Southwest Merchandising Corp. v. NLRB, 53 
F.3d 1334, 1341 (D.C. Cir. 1995) (quoting Caterair Intl., 22 
F.3d at 1120). Moreover, the resolution of conflicts in the 
evidence must be viewed in the context of the on-going 

__________
McQuaide's non-discriminatory explanation successfully rebutted 
the charges.


conflict between McQuaide and its employees' organizing 
efforts, an evaluation that the ALJ and the Board were better 
attuned to perform. It was McQuaide's burden to show, in 
effect, that the two drivers could not reasonably think that 
work was being withheld. So viewed, the evidence presents 
no basis to overturn either the ALJ's credibility determina-
tions, as accepted by the Board, nor his resolution of conflicts 
and interpretation of the situation at the company's facilities.

 Accordingly, we deny the petition except with regard to 
Jack Boyes' termination, and remand that matter to the 
Board to address the impact of evidence regarding twenty-
three other employees who were discharged for call-in infrac-
tions.