United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 20, 1998 Decided November 17, 1998 

 No. 98-1054

 Cadbury Beverages, Inc., 

 Petitioner

 v.

 National Labor Relations Board, 

 Respondents

 On Petition for Review and Cross-Application for 
 Enforcement of an Order of the National 
 Labor Relations Board

 Richard N. Chapman argued the cause and filed the briefs 
for petitioner.

 David Habenstreit, Supervisory Attorney, National Labor 
Relations Board, argued the cause for respondent. With him 
on the brief were Linda Sher, Associate General Counsel, 
John D. Burgoyne, Acting Deputy Associate General Counsel, 
and Deborah E. Shrager, Attorney.


 Before: Silberman, Williams, and Ginsburg, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Silberman.

 Silberman, Circuit Judge: Petitioner Cadbury Beverages, 
Inc. seeks review of the NLRB's decision and accompanying 
order that Cadbury violated sections 8(a)(1) and 8(a)(3) of the 
National Labor Relations Act when it suspended and termi-
nated Eugene Matzan. The Board filed a cross-application 
for enforcement of its order. Since--although it is close--we 
find substantial evidence supporting the Board's determina-
tion, we deny the petition for review and grant the cross-
application for enforcement.

 I.

 Eugene Matzan is an electrician in Cadbury's food process-
ing plant in Williamson, New York. In the early months of 
1995, Matzan, who had become discontented with the perfor-
mance of the incumbent union (Retail, Wholesale and Depart-
ment Store Union, Local 220, AFL-CIO) and its fiscal man-
agement, made several requests to union officials to review 
the union's financial records and its by-laws. After distribut-
ing copies of one such document to fellow employees, union 
officials called a meeting (which James Fischette, Matzan's 
supervisor, ordered Matzan to attend) at which union officials 
put pressure on Matzan to cease his anti-incumbent activities. 
After Matzan circulated a petition calling for a meeting to 
consider changes to the union's by-laws and to review an 
audit, Fischette informed Matzan that union business was not 
permitted on company time (despite Matzan's insistence that 
his union activity occurred during breaks).

 Matzan's suspension arose out of a conversation in mid-
March 1995 between Matzan and his co-worker Lisa Dennis, 
who had recently returned from maternity leave. According 
to Matzan, Dennis told Matzan that she had not received an 
expected bonus and was planning to ask Larry Graffius, the 
union's then-vice president, for assistance. Matzan then ad-
vised Dennis against informing Graffius because two months 
earlier Matzan had overheard Graffius tell Jane DeGroote, 

Cadbury's human resources coordinator, that the company 
should have fired Dennis (whom Graffius identified with an 
unflattering expletive) when it had the chance to do so. At a 
meeting later in March, union president Blackmon told Mea-
dor, Cadbury's human resources manager, that Matzan had 
been spreading a false rumor that Blackmon, Graffius, and 
Meador wanted to fire Dennis because she had taken mater-
nity leave. Meador decided to investigate the matter immedi-
ately and called Dennis, Matzan, and DeGroote into the 
meeting for questioning. Recollections differ as to who said 
what at the meeting about the story that Matzan told Dennis. 
The crux of the dispute is whether Graffius said anything at 
all to DeGroote about firing Dennis, and whether Matzan's 
story implicated Meador or DeGroote, along with Graffius, in 
making the negative comments about Dennis. Meador ulti-
mately concluded, based primarily on DeGroote's shocked 
reaction when confronted with Matzan's story, that Matzan's 
story was most likely false and that the potential damage to 
DeGroote, Meador, and the human resources department was 
sufficiently serious to warrant suspension without prior warn-
ing. After Matzan walked out of a meeting on April 10 to 
discuss the situation before the company imposed discipline, 
Matzan was suspended for three days.1

 Matzan's termination arose out of his attempt to attend an 
arbitration hearing of a co-worker, Bill Gowan, on Monday, 
September 11, 1995. Although Matzan had conducted an 
unofficial investigation of Gowan's case at the request of a 
union steward, Matzan had no official role to play at Gowan's 
arbitration hearing and planned to attend solely because he 
had given Gowan his word that he would try to do so (Gowan, 
according to Matzan, did not trust the union representative.). 
On September 6 or 7, Matzan asked Fischette if he could 
work an earlier shift on Monday, September 11, explaining 
that he needed the schedule change for "personal" reasons. 

__________
 1 Matzan was suspended again later in April in an unrelated 
incident that did not form part of the general counsel's charges 
against the company. At that time Matzan was given a warning 
that further disciplinary problems could lead to his termination.


Fischette told Matzan that the schedule change would proba-
bly not be a problem and that he would see what he could do. 
On Friday, after Fischette learned that Monday was the 
beginning of the "fall pack season," the busiest day of the 
year for the whole plant, Fischette told Matzan that he could 
not work the earlier shift. When Matzan insisted that he 
needed the time for personal business, Fischette told Matzan 
to see if he could reschedule his business and that if he could 
not, to tell Fischette how much time he needed.

 On Saturday, Fischette again told Matzan that he could not 
switch his schedule. But when Matzan informed Fischette 
that his still unidentified "personal business" would only take 
a couple of hours and that he could probably take care of it on 
his lunch hour, Fischette again indicated some flexibility, 
telling Matzan that they would have to wait until Monday to 
decide. Later that Saturday, however, Fischette learned 
from Tony Peluso, another electrician, that Matzan wanted 
the time to attend Gowan's arbitration. On Monday morning, 
after Matzan reiterated that he needed the time for "personal 
business," Fischette asked Matzan directly whether he was 
planning to attend Gowan's arbitration. Matzan indicated 
that he could go where he liked on his lunch hour, and 
Fischette then instructed Matzan not to attend the arbitration 
and that he would be subject to discipline if he did. Later 
that morning, each tried to page the other to no avail: 
Fischette needed Matzan to fix a malfunctioning conveyor, 
and Matzan wanted to tell Fischette that he was taking an 
early lunch and that Peluso would cover for him (even though 
company policy permitted such lunch substitutions without 
supervisory approval). A security guard, pursuant to Fis-
chette's instruction, informed Matzan on his way out that he 
was needed on the floor, but Matzan told the guard that he 
was going to lunch and proceeded to the conference room for 
the arbitration. After Cadbury's attorney insisted that Mat-
zan leave Gowan's arbitration, Matzan returned to work, 
whereupon Fischette, following Meador's instructions, imme-
diately suspended Matzan. Meador and Fischette deliberat-
ed further and Cadbury terminated Matzan by letter on 
September 15.


 The general counsel filed charges alleging that the compa-
ny violated section 8(a)(1) of the NLRA when it suspended 
Matzan, and that it violated sections 8(a)(1) and 8(a)(3) when 
it terminated him. On the suspension charge, the ALJ found 
that Matzan's discussion with Dennis was protected activity, 
that the company knew it was protected, that Matzan was 
suspended for misconduct in the course of that protected 
activity (defaming Cadbury's human resource department), 
and that Matzan was not in fact guilty of the misconduct 
(since Matzan only implicated union member Graffius in the 
story he told Dennis). The ALJ also considered the compa-
ny's motive in suspending Matzan and concluded that the real 
reason for the suspension was Matzan's protected activity. 
Turning to the unlawful termination charge, the ALJ conclud-
ed that the general counsel satisfied its burden of proving 
that anti-union sentiment was a substantial factor in Matzan's 
termination, and that the company did not carry its burden to 
prove that Matzan's alleged insubordination would have re-
sulted in his termination even in the absence of his protected 
activity. The ALJ ordered Cadbury, among other things, to 
rescind Matzan's suspensions and to reinstate him to his 
former position with back pay.

 The Board, with one member dissenting, affirmed all of the 
ALJ's findings and conclusions and adopted the ALJ's recom-
mended order. The Board ratified the ALJ's decision on the 
suspension charge in a footnote without discussion, pausing 
only to note that the dissenting board member agreed with 
the ALJ on this issue. The Board elaborated its reasons for 
adopting the ALJ's conclusions on the termination charge, 
highlighting Fischette's denial of Matzan's request outright 
only after he learned the purpose of Matzan's request, and 
noting that "[s]uch an abrupt reversal of position clearly 
evidences Respondent's animus toward Matzan's protected 
activities and its retaliatory intent." The Board found that 
Cadbury did not terminate Matzan for insubordination since 
Matzan fully complied with company policy when he attended 
the arbitration. Board member Higgins dissented on 
grounds that Fischette consistently denied Matzan's request 
and that Matzan was insubordinate.


 Petitioner claims that the Board's finding of a section 
8(a)(1) violation for the company's suspension of Matzan was 
not supported by substantial evidence. Petitioner also as-
serts that the Board ignored its own precedent governing 
employees' right to attend arbitration hearings when it con-
cluded that petitioner's termination of Matzan violated sec-
tions 8(a)(1) and 8(a)(3). In what appears to be an argument 
in the alternative on this second point, petitioner claims that 
substantial evidence does not support the Board's determina-
tion that the company's termination of Matzan was motivated 
by anti-union animus.

 II.

 Petitioner argues that the suspension could not constitute a 
section 8(a)(1) violation "as a matter of law" because Matzan's 
conversation with Dennis was not protected, concerted activi-
ty. In support of this argument, the company relies on 
Board precedent establishing the well-settled proposition that 
mere talk between co-workers is not concerted activity pro-
tected by the NLRA. See, e.g., Daly Park Nursing Home, 
287 N.L.R.B. 710 (1987). What petitioner overlooks, howev-
er, is that the ALJ's opinion, adopted by the Board, specifical-
ly distinguished the Daly Park line of cases from those Board 
cases establishing the rule that discussion among employees 
about subjects affecting their employment is, when directed 
toward future action, protected, concerted activity. See, e.g., 
Express Messenger Sys., 301 N.L.R.B. 651 (1991); Jhirmack 
Enter., 283 N.L.R.B. 609 (1987).

 Matzan's conversation with Dennis about not turning to 
Graffius for assistance in obtaining a bonus clearly falls 
within this latter line of cases. Nor are we impressed with 
petitioner's argument that substantial evidence does not sup-
port the Board's finding that Dennis and Matzan were talking 
about Dennis' bonus. Although Dennis could not remember 
the context of the conversation, she did not contradict Mat-
zan's account. This is an issue of credibility on which the 
ALJ was entitled to credit Matzan's testimony (petitioner's 
assertion that Matzan's testimony was self-contradictory is 


the product of selective transcript snipping and borders on 
the frivolous). Petitioner should be aware that we do not 
reverse the Board's adoption of an ALJ's credibility determi-
nations unless, unlike here, those determinations are "hope-
lessly incredible," "self-contradictory," or "patently unsup-
portable." Capital Cleaning Contractors, Inc. v. NLRB, 147 
F.3d 999, 1004 (D.C. Cir. 1998); Elastic Stop Nut Div. of 
Harvard Indus., Inc. v. NLRB, 921 F.2d 1275, 1281 (D.C. Cir. 
1990).

 Petitioner alternatively asserts that the conversation was 
not protected activity because Matzan's reckless disregard of 
whether the story he told Dennis was true or false rendered 
his remarks so defamatory as to lose the protection of the 
Act. See HCA Health Servs. v. New Hampshire, Inc., 316 
N.L.R.B. 919 (1995). Petitioner claims that Matzan "serious-
ly impugned" the reputation of the human resources depart-
ment by implicating Meador or DeGroote in making negative 
remarks about Dennis. But the ALJ was entitled to credit 
the testimony, including testimony from Dennis, indicating 
that Matzan accused Graffius alone.

 We think very little of petitioner's contention that an 
employee is under some obligation to verify the truth of what 
the employee himself overhears, when the sole reason for the 
employee's allegedly defamatory statement is to communicate 
the fact that the conversation he overheard occurred. Unlike 
the situation in which an employee repeats a rumor told to 
him by another without verifying the facts underlying the 
rumor, see HCA Health Servs., there was nothing for Matzan 
to verify when he told Dennis what he heard Graffius say to 
DeGroote. Any duty to avoid reckless rumor-mongering does 
not impose an obligation to verify the competence of one's 
auditory faculties. In any event, the ALJ credited Matzan's 
testimony that the conversation between Graffius and De-
Groote in fact occurred, based in part on an adverse inference 
from Graffius' failure to testify,2 and in part on the ALJ's 
discounting of DeGroote's impassioned denial given the vari-

__________
 2 We note that it is somewhat unusual for the ALJ to treat a 
union vice-president as a witness "presumably friendly" to an 
employer's case. See Gatliff Coal Co., 301 N.L.R.B. 793 n.2 (1991), 

ous competing reasons that may have motivated her (such as 
protecting herself from possible discipline). In sum, there is 
easily substantial evidence supporting the ALJ's and the 
Board's finding that Matzan's protected conversation oc-
curred and that it did not become unprotected because of the 
manner in which it was communicated.

 The Board's decision on the suspension claim is thus readi-
ly resolved. In cases involving employee discipline for al-
leged misconduct in the course of a protected activity that the 
employer knew was protected, an employer violates section 
8(a)(1) if it is proven that the alleged misconduct did not 
occur, whether or not the employer acted in good faith. See 
NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 23 (1964). This 
case, as the ALJ understood, fits squarely in the Burnup & 
Sims framework: Matzan's actions were protected, the com-
pany knew that they were protected,3 and Matzan was sus-
pended for defamation in the course of protected activity that, 
according to the substantial evidence relied upon by the ALJ, 
simply did not occur. Although the ALJ went on to discuss 
Cadbury's motive for suspending Matzan, we agree with the 
Board's counsel on appeal that Burnup & Sims explicitly 
obviates the need to inquire into intent and ends the analysis.4

__________
enforced 953 F.2d 247 (6th Cir. 1992). However, given the special 
circumstances of this case--involving an employee waging a cam-
paign against an incumbent union that the record shows manage-
ment favored and joined forces with against the employee--we 
think the ALJ was entitled to treat Graffius as a witness presum-
ably friendly to the company's case, whose failure to testify permit-
ted an adverse inference that Graffius made the comment that 
Matzan attributed to him. See generally UAW v. NLRB, 459 F.2d 
1329 (D.C. Cir. 1972).

 3 It is true that petitioner's litigation arguments that the conver-
sation was not protected could be taken to imply that the company 
did not know at the time that Matzan's conversation with Dennis 
was protected. However, because petitioner does not challenge the 
ALJ's determination that it knew of Matzan's protected activity, 
petitioner has waived that argument.

 4 The ALJ thought, and the Board did not correct him, that the 
Board typically inquires as part of the Burnup & Sims inquiry 

 III.

 Petitioner's argument against the Board's termination deci-
sion is really only another substantial evidence challenge 
subject also to limited and "highly deferential" review. Al-
lentown Mack Sales & Serv., Inc. v. NLRB, 118 S. Ct. 818, 
823 (1998) (substantial evidence inquiry is "whether on this 
record it would have been possible for a reasonable jury to 
reach the Board's conclusion"); Capital Cleaning Contrac-
tors, 147 F.3d at 1004. Petitioner attempts to dress this 
pedestrian challenge in the slightly more rarefied doctrinal 
clothes of the Board's obligation to adhere to its own prece-
dents. But as we explain, petitioner's argument, stripped 
down, is nothing more than a bare, and ultimately futile, 
substantial evidence challenge.

 The precedent in question is Ohmite Mfg. Co., 290 N.L.R.B. 
1036, 1037-39 (1988), which holds that, in order for an em-
ployer's refusal to allow an employee to attend a Board 
hearing to constitute an unfair labor practice, the general 
counsel must first make a prima facie case that the refusal 
was improperly motivated or that the employee had a "real 
need" to attend the hearing. The burden then shifts to the 
employer either to discredit the general counsel's evidence of 
improper motivation, or to show that it had an overriding 
business reason for its refusal that outweighs the employee's 

__________
whether the challenged action would have taken place even in the 
absence of the protected activity. But that analysis is generally 
appropriate in the sort of case in which the general counsel's charge 
is based on an unlawful motive--it gives the employer the opportu-
nity to prove that, despite any unlawful motive, the same action 
would have occurred pursuant to some additional, lawful motive. 
See Wright Line, Inc. 251 N.L.R.B. 1083 (1980), enforced 662 F.3d 
899 (1st Cir. 1981). In any event, the ALJ actually conducted a 
different analysis, and asked whether Cadbury's asserted reason for 
Matzan's suspension--the misconduct--was pretextual. But since 
Burnup & Sims imposes liability for an employment action errone-
ously taken because of alleged misconduct, regardless of motive, see 
Allied Indus. Workers v. NLRB, 476 F.2d 868, 880 (D.C. Cir. 1973), 
it is plainly irrelevant whether Cadbury's proffered reason for 
acting was pretextual.

need to attend the hearing. See id. Petitioner of course 
maintains that, because Matzan had no real need to attend 
Gowan's arbitration, the company's business interests tip the 
scale in its favor. But in concluding that that fact immunizes 
the company from liability, petitioner reads the disjunctive 
out of Ohmite, and seemingly asserts the baffling proposition 
that the Board must always engage in Ohmite's balancing, 
irrespective of the motivation behind the employer's refusal. 
We need do no more than state Ohmite's holding to show that 
petitioner's view is plainly not the law of the Board, nor the 
law of this circuit, see Service Employees Int'l Union Local 
250 v. NLRB, 600 F.2d 930, 935-37 (D.C. Cir. 1979). The 
Board did not ignore its own precedent; petitioner simply 
misunderstood it.5

 Petitioner's real complaint, then, is that the Board's finding 
of discriminatory motive in Matzan's termination was not 
supported by substantial evidence and here it is on firmer 
ground. In order for an employer's discharge of an employee 
to constitute an unfair labor practice, the general counsel 
must first prove that the activity for which the employee was 
fired was protected, that the employer was aware of the 
protected activity, that the timing of the contested discharge 
is proximate to the protected activities, and ultimately that 
anti-union animus was a substantial or motivating factor in 
the termination. See Wright Line, Inc., 251 N.L.R.B. 1083 
(1980), enforced 662 F.2d 899 (1st Cir. 1981), approved by the 
Supreme Court in NLRB v. Transportation Management 
Corp., 462 U.S. 393 (1983); Meco Corp. v. NLRB, 986 F.2d 

__________
 5 We note that in cases involving discriminatory motive in the 
denial of a request to attend a hearing, such as this one, the Board 
applies the motive test of Wright Line, which essentially takes the 
case out of Ohmite altogether. This is important because the 
Wright Line test has been subject to important clarifications by the 
Supreme Court (notably that the burden of persuasion always rests 
on the general counsel, see Office of Workers' Compensation Pro-
grams v. Greenwich Collieries, 114 U.S. 2251, 2258 (1994)), which 
are not evident from Ohmite's use of the term "prima facie" case to 
describe the general counsel's initial burden. See Southwest Mer-
chandising Corp. v. NLRB, 53 F.3d 1334, 1339-40 (D.C. Cir. 1995).


1434, 1437 (D.C. Cir. 1993). Even if the general counsel 
sustains this burden, the employer can successfully defend by 
proving as an affirmative defense that the challenged termi-
nation would have occurred even in the absence of the 
protected conduct. See Wright Line, 251 N.L.R.B. at 1089; 
NLRB v. Transportation Management. Corp., 462 U.S. at 
399-400; see generally Southwest Merchandising, 53 F.3d at 
1339-40.

 Petitioner's case is considerably helped because both the 
ALJ and the Board included in their opinions factual findings 
that can in no way be thought supported by substantial 
evidence. For example, in explaining that Cadbury was 
aware of Matzan's protected union activities, both the Board 
and the ALJ seemed to suggest that Cadbury was aware of 
Matzan's participation in the investigation and preparation of 
Gowan's arbitration case. But as petitioner effectively points 
out, nothing in the record indicates that the company knew of 
Matzan's pre-arbitration assistance before September 15 (the 
day on which Matzan was fired). The ALJ, moreover, reject-
ed as "almost pretextual" petitioner's asserted reason for 
discharging Matzan partly on the ground that there was no 
evidence in the record of major electrical problems when 
Fischette claimed to have needed Matzan on the line (be-
tween 9:00 and 10:00 a.m.). Yet, Fischette specifically testi-
fied that there was a broken conveyor on Line A around 9:25 
a.m. and that the other electricians were busy. Last, the 
Board rejected Cadbury's claim that Matzan was insubordi-
nate when he left the plant despite Fischette's explicit order 
forbidding it in part because of Cadbury's supposed policy 
that electricians were not required to respond to pages when 
they are en route to lunch. But Fischette explicitly denied 
that such a policy existed and pointed to special time cards 
that employees carry for the very purpose of enabling them 
to respond to pages while at lunch. The only evidence 
supporting Cadbury's supposed policy, besides Matzan's rath-
er self-serving account, was testimony from the security 
guard that about 5% of employees do not respond to pages 
when they are on their way home (rather unconvincing proof 


of any company policy, let alone one governing pages at 
lunchtime).

 Still, the Board focused its finding of anti-union animus 
directed at Matzan's protected activity6 on Fischette's abrupt 
change in position after learning that Matzan wanted time off 
to attend Gowan's arbitration hearing--a factual finding 
which is supported by uncontroverted evidence and which we 
think is sufficient on its own to support the Board's finding of 
anti-union animus. See United Steelworkers Local Union 
14534 v. NLRB, 983 F.2d 240, 244 (D.C. Cir. 1993) (holding 
that factual findings may be reversed only when the record is 
so compelling that no reasonable fact-finder could fail to find 
the contrary). It is true that, as dissenting Board member 
Higgins and petitioner contend, Fischette consistently denied 
Matzan permission to take time off or to switch his shifts. 
But that truth is also plainly beside the point, since the ALJ 
and the Board majority focused on Fischette's change in 
position from a tentative denial on September 9, to an out-
right rejection on September 11, with the sole intervening 
fact Fischette's discovery of Matzan's plan to attend the 
hearing. And petitioner's theory that Fischette was intuitive-

__________
 6 Petitioner argues that Matzan's attendance at Gowan's hearing 
was not protected activity because Matzan had no "real need" to 
attend and could not have survived Ohmite's balancing test. But 
the suggestion that an employee who would fail the Ohmite balanc-
ing test is necessarily engaged in unprotected activity if he attends 
the hearing is a blatant case of mixing apples and oranges. That an 
employee's right to attend a hearing may be trumped by an 
employer's countervailing business reasons does not mean that 
attending a hearing of a co-worker is unprotected activity. If that 
were so, Ohmite balancing's test would eviscerate Ohmite's alterna-
tive consideration of whether the motivation for the denied request 
was discriminatory (which presupposes that attendance at a co-
worker's hearing, even without a "real need" to attend, is protected 
activity). Although we see no need to speculate as to the precise 
scope of this protected activity, we think the Board was correct that 
an employee's attendance at the arbitration hearing of a co-worker, 
where the employee had helped in investigating the co-worker's 
grievance and the co-worker requested the employee's presence, is 
protected activity.

ly performing Ohmite's balancing test when he denied Mat-
zan's request is, though artful advocacy, simply a highfalutin 
(and, we might add, rather unrealistic) way of saying that 
Fischette and the company had no unlawful motive--which is 
precisely what the ALJ and the Board rejected. The Board 
majority was entitled to hang its hat on Fischette's flip-flop. 
Although hardly overpowering evidence of animus, we cannot 
call it insubstantial, even though a finding of no animus would 
have been easily justifiable on these facts, see Universal 
Camera Corp. v. NLRB, 340 U.S. 474, 477, 488 (1951), and 
one that we might be inclined to make were we deciding the 
issue ourselves, see Elastic Stop Nut, 921 F.2d at 1279. As 
we have explained before, our review of the Board's motive 
determinations, including inferences of improper motive 
drawn from the evidence, is especially deferential. See Capi-
tal Cleaning Contractors, Inc., 147 F.3d at 1004; Laro Main-
tenance Corp. v. NLRB, 56 F.3d 224, 229 (D.C. Cir. 1995).

 We also think the Board's conclusion at the second step of 
the Wright Line test is supported by substantial evidence. 
We emphasize that the question on review is not, as petitioner 
would have it, whether the Board's conclusion that Matzan 
fully complied with Cadbury's policies is supported by sub-
stantial evidence. If it were, this case would be even closer 
than it already is, for as we noted above, the Board's finding 
to that effect is, to be charitable, thinly supported. The 
Board's discussion of the insubordination issue, however, 
must be placed in its doctrinal context: it is a subsidiary 
aspect of petitioner's overall burden to prove, as an affirma-
tive defense, that despite any anti-union animus, petitioner 
would have fired Matzan because of his insubordination, not 
that it could have done so. See Wright Line, 251 N.L.R.B. at 
1089 (employer's burden is to "demonstrate that the same 
action would have taken place even in the absence of the 
protected conduct") (emphasis added); Southwest Merchan-
dising, 53 F.3d at 1340 (company bears the burden of proving 
that nondiscriminatory motive was in fact the cause of the 
action). It was therefore not incumbent on the general 
counsel to prove, nor on the Board to find, that the company's 
asserted nondiscriminatory reason of insubordination was 


pretextual--that is, "wholly without merit"--although such a 
showing would have served as a conclusive rejection of Cad-
bury's affirmative defense. Wright Line, 251 N.L.R.B. at 
1084 & n.5; Southwest Merchandising, 53 F.3d at 1339 n.7 
(distinguishing "dual motive" and "pretext" cases). The ques-
tion for us is whether substantial evidence supports the ALJ's 
finding, adopted by the Board, that Cadbury failed to prove 
an actual, lawful motivation for Matzan's termination.7

 The ALJ explicitly found, given the illicit motive evident 
from the circumstances of Fischette's change in position, that 
Cadbury would not have fired Matzan were it not for its anti-
union animus. See Southwire Co. v. NLRB, 820 F.2d 453, 463 
(D.C. Cir. 1987) (affirming Board's finding that employer 
failed its affirmative defense because of the evidence of illicit 
motive and because the ALJ concluded that the real reason 
for the discharge was the employee's union activities and not 
his admitted rule violation). All of petitioner's evidence de-
signed to undermine this conclusion relates to its formal 
policy against unauthorized leaving, which completely ignores 
the uncontroverted evidence that electricians were permitted 
by company policy to switch their lunch breaks without 
authorization if they arranged for a replacement (which Mat-
zan did). Petitioner's notion, adopted by dissenting Board 
member Higgins, that Fischette gave an advance refusal of 
Matzan's ordinary ability to switch his lunch would be persua-
sive were it not for the crucial finding that the advance 
refusal was tainted by an illicit motive. Petitioner cannot 
overcome its burden at Wright Line step two by pointing to 
an employee's unwillingness to comply with an order that the 
Board determined (and which we affirm) to be unlawful at 

__________
 7 Petitioner cites the Board's decision in Jordan Marsh Stores 
Corp., 317 N.L.R.B. 460 (1995), for the proposition that an employer 
proves its affirmative defense simply by showing that it reasonably 
believed that the employee engaged in misconduct at the level 
warranting termination. Of course, the relevant belief is the belief 
that the company had at the time it fired Matzan; that petitioner 
can show a reasonable basis for having fired Matzan now is rather 
unavailing if, at the time, petitioner was motivated only by anti-
union animus.

Wright Line step one. And although the general counsel's 
proof of a policy authorizing employees to ignore pages is less 
than compelling, petitioner, on whom the evidentiary burden 
lies, has not pointed to any policy authorizing termination for 
failure to respond to a page en route to lunch (the only 
plausible grounds for believing Matzan to be insubordinate), 
nor has it offered any evidence of similar treatment of those 
employees who have acted similarly. See Capital Cleaning, 
147 F.3d at 1007 (upholding Board's finding of unlawful 
motive at Wright Line step two because the employer "failed 
utterly" to show that it would have taken the same action 
absent its unlawful motive).

 To be sure, the Board did not state the issue in these 
terms; it remarked only on the question whether the compa-
ny's asserted insubordination defense was pretextual (i.e., 
that no insubordination in fact occurred). But, the Board 
adopted all of the ALJ's findings and conclusions, including 
the conclusion that Cadbury would not have terminated Mat-
zan for insubordination (if any). See Elastic Stop Nut, 921 
F.2d at 1281 (affirming Board's order based on Board's 
adoption of the ALJ's specific findings rejecting employer's 
Wright Line defense, even though Board itself provided no 
discussion of that issue). We will not upset that conclusion, 
and the ALJ's more detailed discussion supporting it, simply 
because the Board's opinion also discussed a pretext theory 
that, while less than persuasive, was unnecessary for the 
Board to reach.

 For the foregoing reasons, we deny the petition for review 
and grant the cross-application for enforcement of the 
Board's order.